**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

OCEANA, INC.
    1350 Connecticut Ave, NW, 5th Floor
    Washington, DC 20036

        Plaintiff,

    v.

GARY LOCKE, in his official capacity as
    Secretary of the United States
    Department of Commerce
    Office of the Secretary
    Room 5858
    14th Street and Constitution Ave., NW
    Washington, DC 20230;

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
    Department of Commerce
    Room 5128
    14th Street and Constitution Ave., NW
    Washington, DC 20230; and

NATIONAL MARINE FISHERIES SERVICE
    Department of Commerce
    Room 14636
    1315 East-West Highway
    Silver Spring, MD 20910

        Defendants.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.    This case concerns the failure of defendants, the National Marine Fisheries

Service, et al. (hereinafter, the "Fisheries Service"), to establish an adequate management system

to prevent overfishing under Amendment 16 ("Amendment 16") to the Northeast Multispecies

Fishery Management Plan.

http://www.nefmc.org/nemulti/planamen/Amend16/final_amend16_oct09.html.  A notice

announcing the finalization of Amendment 16 and the publication of the final rule implementing

measures approved under Amendment 16 was published in the Federal Register on April 9,

2010.  75 Fed. Reg. 18262.  The flawed management plan fails to establish a bycatch monitoring

system adequate to track catch for the purpose of complying with catch limits during the fishing

season, and fails to impose accountability measures on certain fishing vessels with regard to

certain stocks, so that fishing enterprises have no incentive to stay within the catch limits set for

the stocks.

2.      As Amendment 16 itself makes clear, most of the New England groundfish

stocks are overfished, with one – Atlantic halibut – so severely depleted that it will take until

2055 to rebuild the stock.  Amendment 16, § 1.0 at 12.  Other overfished stocks include

yellowtail flounder, windowpane flounder, witch flounder, cod, pollock, ocean pout and Atlantic

wolffish.  *Id.*

3.      Amendment 16 establishes a new system for managing Northeast fisheries, as

required by the 2006 amendments to the Magnuson-Stevens Fishery Conservation and

Management Act ("Magnuson-Stevens Act").  16 U.S.C. §§ 1801 et seq.; Pub. L. No. 109-479,

120 Stat. § 3575 (2007).  Significantly, Amendment 16 introduces the concepts of enforceable

"annual catch limits" ("ACLs") for regulated stocks, and "accountability measures" to prevent

ACLs from being exceeded.  Amendment 16, § 1.0 at 8.

4.      This new system is a significant departure from the longstanding system of

regulating Northeast fisheries primarily by controlling fishing effort, which is done by limiting

the number of permits issued and days at sea, by regulating gear types, and through other

measures.

5.      Oceana supports a catch limit-based system, and believes that in concept, Amendment 16 offers a bold new direction for management of the troubled Northeast groundfish fishery into effective output-based management with true accountability.  In its details, however, Amendment 16 fails to live up to its promise in a number of significant ways.

6.      The term "bycatch" refers to fish that are incidentally caught by vessels targeting other fish and are discarded, usually dead or dying.

7.      Given that fishing grounds are complex ecosystems and not monocultures, a significant amount of bycatch occurs as a result of ordinary fishing effort.  This bycatch includes discards of stocks managed under the fishery management plan and subject to limits on total catch (i.e., ACLs).

8.      Under a catch-limit system, it is critical to accurately assess bycatch in order to determine if ACLs are exceeded and overfishing is occurring.

9.      Unfortunately, Amendment 16 relies on a bycatch reporting methodology that was not designed for use in a system with enforceable catch limits and accountability measures. By the Fisheries Service's own admission, the methodology cannot reliably provide the information and monitoring necessary for enforcing catch limits.  Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment ("SBRM Amendment"), http://www.nefmc.org/issues/sbrm/planamen/SBRM_Omnibus_Amendment_bookmarked.pdf at 223.  As a result, the reliability of the new system is compromised from the start.

10.      In addition, Amendment 16 fails to establish the required accountability measures to protect against overfishing of Atlantic halibut, ocean pout, windowpane flounder, Southern New England/Mid-Atlantic ("SNE/MA") winter flounder, Atlantic wolffish, and yellowtail flounder, all of which are severely depleted.  While the Amendment does call for establishing

ACLs for these stocks, it does not enforce the ACLs through adequate accountability measures in all of the fishery sectors that will inevitably catch these stocks as bycatch.

11.     With respect to Atlantic halibut, ocean pout, windowpane flounder, SNE/MA winter flounder, and Atlantic wolffish, the Amendment prohibits the retention of these stocks by vessels operating under the catch sector provisions of the fishery management plan.

12.     The problem with this approach is that it imposes no controls on the amounts of these stocks that the sectors catch and discard.  In the absence of any such controls, it is impossible to meaningfully enforce the ACLs for these stocks.

13.     With respect to yellowtail flounder, Amendment 16 fails to impose accountability measures on that portion of the total catch caught as bycatch in the scallop fishery.  By its own terms, Amendment 16 defers the imposition of accountability measures to control bycatch of yellowtail flounder in the scallop fishery until the agency develops an amendment to the scallop fishery management plan.  Amendment 16 states that this will occur by March 2011, but there is no certainty that it will happen then or any time in 2011.

14.     There are three separate stocks of yellowtail flounder that are regulated under the Plan: Georges Bank, SNE/MA, and Cape Cod/Gulf of Maine.  All three of these stocks are seriously depleted, with biomass reported to be only 22% , 13%, and 25%, respectively, of biomass necessary to produce the maximum sustainable yield.  Assessment of 19 Northeast Groundfish Stocks through 2007, *Report of the 3rd Groundfish Assessment Review Meeting (GARM III), Northeast fisheries Science Center, Woods Hole, Massachusetts, August 4-8, 2008*, pp. 2-129, 2-165, 2-200, http://www.nefsc.noaa.gov/nefsc/publications/crd/crd0815/.

15.     By deferring the imposition of accountability measures for yellowtail flounder in the scallop fishery until at least 2011 and possibly later, Amendment 16 makes these stocks vulnerable to continued overfishing, with consequences that could take years to reverse.

16.     Oceana brings this lawsuit to compel the Fisheries Service to establish an adequate management system to enforce annual catch limits, including a bycatch monitoring system sufficient to provide the catch data needed to enforce catch limits, and the required accountability measures to reduce the amount of groundfish caught as bycatch in the New England fisheries, so that overfishing is prevented and those overfished stocks can be rebuilt, as required by law.

## JURISDICTION AND VENUE

17.     Oceana brings this action under the Magnuson-Stevens Act, 16 U.S.C. § 1855(f); the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370e; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

18.     This Court has jurisdiction over this action by virtue of the Magnuson-Stevens Act, which provides that "the district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Magnuson-Stevens Act, 16 U.S.C. § 1861(d), and that regulations promulgated under the Act shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." *Id.* § 1855(f).

19.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the ... laws ... of the United States" and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action

in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

20.     Jurisdiction is also found under the APA, 5 U.S.C. § 706(2), which authorizes a court to "set aside agency action, findings, and conclusions found to be …(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and 5 U.S.C. § 704, which provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court."

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

22.     The District Court may issue a declaratory judgment in this case pursuant to 28 U.S.C. §§ 2201-2202, and may grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§ 1861(d) and 1855(f), and the APA, 5 U.S.C. § 706.

## PARTIES

23.     Plaintiff Oceana is a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education.  Oceana has over 24,000 members around the world, including over 6,000 members in the coastal states from Maine to Florida. Oceana is organized under the laws of the District of Columbia, and maintains its headquarters in Washington, D.C.  It has offices or staff in five states (Alaska, California, Massachusetts, New York, and Oregon) and four foreign countries (Chile, Belgium, Belize, and Spain).  Through its policy, scientific, litigation, and grass-roots activities, Oceana has been a prominent advocate for protecting overfished stocks, including Northeast groundfish stocks, and promoting environmentally and economically sustainable fisheries.  Oceana has participated in administrative proceedings before government agencies,

litigated before courts, and issued reports to the public, all in the service of protecting marine resources and wildlife.

24.     Oceana's members use and enjoy the oceans for numerous activities, including fishing, scuba diving, snorkeling, boating, swimming, beach walking, research and study. Oceana's members value a healthy marine environment.  Oceana's members also consume seafood.  They are concerned about and directly affected by environmental injury caused by unsustainable fishing practices in Northeast fisheries.  Such injuries include injury to their consumption and commercial and recreational use of fish populations that are depleted as a result of unsustainable management caused, in part, by inadequate catch monitoring systems and accountability measures.

25.     Oceana and its members suffer direct and immediate injury as a result of the Fisheries Service's failure to establish adequate catch monitoring systems and accountability measures.  These interests will continue to be impaired unless the Court grants the relief requested herein.

26.     Defendant Gary Locke is Secretary of the United States Department of Commerce.  He is sued in his official capacity as the chief officer of the federal agency charged by the United States Congress with managing United States marine fisheries.

27.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary of Commerce has delegated responsibility for managing United States marine fisheries to NOAA, which in turn has sub-delegated that responsibility to the National Marine Fisheries Service.

28.     Defendant National Marine Fisheries Service is an agency of the United States Department of Commerce that has been delegated the primary responsibility to manage United States marine fisheries through fishery management plans, plan amendments, and regulations implementing those plans and plan amendments.

## STATUTORY AND REGULATORY BACKGROUND

## I.     THE ADMINISTRATIVE PROCEDURE ACT

29.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  *Id.* § 704.

30.     In an APA suit, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be - - (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

## II.    UNDER THE MAGNUSON-STEVENS ACT, FISHERIES ARE GOVERNED UNDER A TWO-TIERED SYSTEM IN WHICH REGIONAL COUNCILS ADVISE THE FISHERIES SERVICE

31.     The Magnuson-Stevens Act established an elaborate system for conserving and managing fish populations found primarily in United States territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (three miles from shore in the Northeast United States) to 200 miles offshore or to an international boundary with neighboring countries.

32.     The Magnuson-Stevens Act created eight regional fishery management councils and charged them with preparing fishery management plans for managed species.  The New

England Fishery Management Council has jurisdiction over the Northeast Multispecies ("Groundfish") fishery.  16 U.S.C. § 1852(a)(1)(A), Amendment 16, § 1.0 at 5.

33.     Councils are initially responsible for developing plans and plan amendments for each fishery "that requires conservation and management" within the councils' respective geographic areas of authority.  *Id.* § 1852(h)(1).

34.     Councils must include in their fishery management plans and plan amendments the measures necessary to conserve and manage particular species of fish.  *Id*. § 1853(a)(1)(A).

35.     After developing a fishery management plan or plan amendment, the council submits the rule to the Secretary of Commerce, who, acting through the Fisheries Service, evaluates the rule for consistency with the national standards set forth at 16 U.S.C. § 1851(a), the other provisions of the Magnuson-Stevens Act, and any other applicable law.  If the Secretary determines that the rule is consistent with the applicable law, the Secretary approves the rule. Otherwise the Secretary must completely, or partially, disapprove the rule. *Id.* § 1854(a).

36.     The Magnuson-Stevens Act sets deadlines for the Secretary to approve, disapprove, or partially approve amendments and promulgate implementing regulations. *Id.* § 1854(a), (b).

## III.    THE MAGNUSON-STEVENS ACT REQUIRES THE FISHERIES SERVICE TO ESTABLISH ACCOUNTABILITY MEASURES TO PREVENT THE OVERFISHING OF REGULATED FISH STOCKS

37.     The Magnuson-Stevens Act requires that all fishery management plans establish a mechanism for specifying ACLs for regulated fish stocks.  16 U.S.C. § 1853(a)(15).

38.     For purposes of the ACL, "catch" includes "the total quantity of fish . . . taken . . . includ[ing] mortality of fish that are discarded."  50 C.F.R. § 600.310(f)(2)(i).

39.     The Magnuson-Stevens Act also requires that fishery management plans include "measures to ensure accountability" to ensure that overfishing does not occur in a fishery.  16 U.S.C. § 1853(a)(15).

40.     Such "accountability measures" are defined in regulations promulgated under the Magnuson-Stevens Act as "management controls to prevent ACLs…from being exceeded, and to correct or mitigate overages of the ACL if they occur."  50 C.F.R. 600.310(g)(1).

41.      The Magnuson-Stevens Act requires that fishery management plans include adequate monitoring measures to track retained catch, 16 U.S.C. § 1853(a)(5), and discarded catch (bycatch), *id.* § 1853(a)(11).

42.     The regulations state that "[w]henever possible, [fishery management plans] should include inseason monitoring and management measures to prevent catch from exceeding ACLs."  50 C.F.R. 600.310(g)(2).

43.     If management measures are not able to prevent an ACL from being exceeded, accountability measures must "correct the operational issue that caused the ACL overage."  *Id.* § 600.310(g)(3).

## IV.     NEPA REQUIRES THE FISHERIES SERVICE TO TAKE A HARD LOOK AT THE ENVIRONMENTAL IMPACTS OF AMENDMENT 16

44.     Congress enacted NEPA in order to require federal agencies to incorporate environmental concerns into the decision-making process.  42 U.S.C. § 4331(a).  In furtherance of this goal, NEPA compels federal agencies prospectively to evaluate the environmental impacts of proposed actions that they carry out, fund or authorize.  NEPA also ensures that the public participates in the decision-making process.

45.     NEPA requires all federal agencies to prepare an environmental impact statement ("EIS") whenever they propose "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

46.     The EIS must detail "alternatives to proposed action."  *Id.* § 4332(2)(C)(iii).

47.     NEPA also provides that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *Id.* § 4332(2)(E).

48.     Regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500-1508, provide the agencies guidance in their task of complying with NEPA.

49.     CEQ regulations require federal agencies "to the fullest extent possible," to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." *Id.* § 1500.2 and 1500.2(e).

50.     The analysis of alternatives "is the heart of the environmental impact statement." *Id.* § 1502.14.

51.     In the EIS analysis of alternatives, the agency shall "[r]igorously explore and objectively evaluate *all* reasonable alternatives."  *Id.* § 1502.14(a) (emphasis added).

52.     An EIS must examine (1) the environmental impacts of the proposed action; (2) any adverse environmental effects that cannot be avoided, if the proposed action proceeds; (3) alternatives to the proposed action; (4) the relationship between local short-term use of the human environment and the maintenance and enhancement of long term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action, if implemented.  *Id.* § 1502.16.

53.     An EIS must also examine the direct, indirect and cumulative effects of the proposed action and any identified alternatives thereto.  *Id.*  "Effects includes ecological (such as effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative."  *Id.* § 1508.8.

## FACTS

54.     The issues addressed in this Complaint have been previously raised on multiple occasions by Oceana in letters to the Fisheries Service and the New England Fishery Management Council.  On December 22, 2006, Oceana submitted comments on the scoping of Amendment 16 to the New England Fishery Management Council (hereinafter, the "December 2006 Comment Letter").  On February 10, 2009, Oceana submitted comments on the development of monitoring alternatives for new groundfish sectors to the New England Fishery Management Council (hereinafter, the "February 2009 Comment Letter").  On June 8, 2009, Oceana submitted extensive comments on the Draft Environmental Impact Statement for Amendment 16 (hereinafter, the "June 2009 Comment Letter").  On November 12, 2009, Oceana submitted extensive comments regarding the control of yellowtail flounder catch by the scallop fishery in 2010 (hereinafter, the "November 2009 Comment Letter").  On December 22, 2009, Oceana submitted extensive comments on the Final Environmental Impact Statement for Amendment 16 (hereinafter, the "December 2009 Comment Letter").

## AMENDMENT 16 USES AN INADEQUATE PERFORMANCE STANDARD FOR MONITORING BYCATCH

55.     The Magnuson-Stevens Act requires that fishery management plans "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery."  16 U.S.C. § 1853(a)(11).  Pursuant to that provision, the Fisheries Service issued a

Final Rule on January 28, 2008, purporting to establish a standardized bycatch reporting methodology ("SBRM") for the thirteen Northeast United States federal fisheries.  Final Rule, Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment, 73 Fed. Reg. 4736, 4737 (Jan 28, 2008); *see also* SBRM Amendment.

56.     The SBRM Amendment made progress over prior fishery management plan amendments by, for the first time, adopting a performance measure "to ensure that the effectiveness of the Northeast Region SBRM can be measured, tracked, and utilized to effectively allocate the appropriate number of observer sea days."  SBRM Amendment, § 1.7 at 11.

57.     The SBRM's performance measure requires that "data collected under the Northeast Region SBRM are sufficient to produce a coefficient of variation (CV) of the discard estimate of no more than 30 percent."  *Id.*  A coefficient of variation is a performance standard used to determine the precision of bycatch measurements.  However, it does not evaluate the accuracy of those estimates as applied to a whole fishery.  For example, if a fishery was comprised of two sectors with entirely different characteristics, and data was collected from one sector but not the other, the estimates drawn from the data might be very precise, but they would not describe the second sector at all, so they would not give an accurate picture of bycatch across the fishery.

58.     The SBRM was developed for the purpose of assessing stocks over the course of a fishing season.

59.     In February 2008, Oceana initiated an action in this Court challenging the SBRM on the ground that it would fail to produce the statistically reliable information on the amount and type of bycatch in the Northeast federal fisheries that is required to manage them sustainably

in compliance with controlling law.  *Oceana v. Locke, et al.*, No. 1:08-cv-00318 (ESH) (D.D.C.

filed Feb. 25, 2008).  That action is still pending.

60.     The SBRM does not to provide the kind of weekly or daily bycatch information

required to enforce the ACLs and accountability measures that are central to Amendment 16.

61.     As Oceana pointed out in its December 2009 Comment Letter, the SBRM

Amendment itself explicitly conceded that it should not be used as a standard for monitoring

ACLs and sectors:

> The SBRM established through this amendment is intended to adequately and
> efficiently provide sufficient information collection and monitoring to comply
> with the *existing* requirements and management systems.  The notion that this
> amendment should predict various possible future fisheries management systems
> and measures (e.g., *species specific hard TACs* in the groundfish fishery or ITQs
> in the sea scallop fishery, etc.) and establish an SBRM that can reliably provide
> information and monitoring under these changed circumstances *is neither realistic
> nor practicable*.  (emphasis added)

December 2009 Comment Letter at 10; SBRM Amendment at 223.

62.     "TAC" means "total allowable catch," Amendment 16, § 2.4 at 51, and a "hard

TAC" is an enforceable catch limit, *see e.g.*, Amendment 16, § 4.2.3.5.3 at 110, such as the

ACLs that were established under Amendment 16.

63.     As the Fisheries Service itself stated, it is "neither realistic nor practicable" to

expect the SBRM to reliably provide information and monitoring for an ACL system such as the

one established in Amendment 16.  SBRM Amendment at 223.  Nonetheless, Amendment 16

adopts the "coefficient of variation" performance standard from the SBRM as a reference point

for monitoring of ACLs and the invocation of accountability measures.  Amendment 16, §

4.2.3.5.3 at 109.

64.     The consequence of using an unreliable performance standard in the new system

is that the Fisheries Service will not have timely, accurate, and precise enough information to

meaningfully enforce ACLs and impose the necessary accountability measures, thereby increasing the likelihood of overfishing.

65.     Despite these flaws, the Fisheries Service, in Amendment 16, discusses the use of at-sea observers to monitor the groundfish fishery, but fails to consider standards of performance for this coverage other than by referring to the SBRM and the analysis that led to the SBRM Amendment.  Amendment 16, § 4.2.3.5.3 at 109.

66.     By relying on the SBRM in a new system for which, by the Fisheries Service's own admission, it was not designed, Amendment 16 entirely fails to consider an important aspect of the management of the fishery.

## AMENDMENT 16 FAILS TO ESTABLISH ACCOUNTABILITY MEASURES FOR A NUMBER OF SPECIES SUBJECT TO CATCH LIMITS

67.     The Magnuson-Stevens Act requires that the fishery management plan contain accountability measures to enforce ACLs.  16 U.S.C. § 1853(a)(15).

68.     Atlantic halibut, ocean pout, windowpane flounder, SNE/MA winter flounder, Atlantic wolffish, and yellowtail flounder are all subject to overfishing.  Amendment 16, § 1.0 at 12.

69.     Amendment 16 fails to establish accountability measures to prevent the continued overfishing of Atlantic halibut, ocean pout, windowpane flounder, SNE/MA winter flounder, and Atlantic wolffish.  Instead, it seeks to prohibit retention of these fish by sector vessels targeting other stocks.  Amendment 16, §§ 4.2.3.3.1, 4.2.3.4, 4.3.5, 4.3.6, 4.3.2.1.

70.     Under this approach, there is *no limit* on the amount of these stocks that sector vessels can catch and discard while targeting other stocks.  As a result, Amendment 16 fails to adequately protect these stocks from continued overfishing.

71.     Oceana raised this issue in its June and December 2009 Comment Letters, and stated that without ACLs and appropriate accountability measures for these stocks, the fishery sectors and common pool will be operating in violation of the Magnuson-Stevens Act.  June 2009 Comment Letter at 5; December 2009 Comment Letter at 9.  The Fisheries Service ignored these comments and finalized Amendment 16 without establishing the required accountability measures.

### AMENDMENT 16 FAILS TO ESTABLISH ACCOUNTABILITY MEASURES FOR YELLOWTAIL FLOUNDER CAUGHT IN THE SCALLOP FISHERY

72.     Amendment 16 also fails to establish accountability measures for yellowtail flounder caught in the scallop fishery.  By its own terms, the Amendment delays the establishment of these accountability measures until Amendment 15 to the Scallop Fishery Management Plan is implemented.  Amendment 16, § 4.2.1.3 at 90-91.

73.     Oceana expressed its concern about this serious regulatory gap in its November and December 2009 Comment Letters.

74.     Amendment 16 states that Amendment 15 to the Scallop Fishery Management Plan is expected to be implemented in March 2011, but there is no legally binding commitment in Amendment 16 that the scallop amendment will be timely completed or that it will contain appropriate accountability measures.  *Id.*  Given that fishery management plan amendments are often repeatedly delayed, it is possible that there will be no accountability measures for yellowtail flounder in the scallop fishery throughout 2011 and into 2012 or beyond.

75.     Without such accountability measures, there *no limit* on how much yellowtail flounder can be caught and discarded in the scallop fishery.  As a result, the scallop fishery in

2010 and 2011 could further deplete the already seriously depleted yellowtail flounder fisheries, and delay the rebuilding of these stocks for years.

76.     By delaying the establishment of accountability measures for yellowtail flounder in the scallop fishery until at least March 2011 and possibly longer, Amendment 16 violates the clear statutory command of the Magnuson-Stevens Act.

### AMENDMENT 16 FAILS TO CONSIDER ANY ALTERNATIVES TO THE ABC CONTROL RULE OTHER THAN THE NO ACTION ALTERNATIVE

77.     As part of the process for developing ACLs, the fishery management council must specify an "acceptable biological catch" ("ABC"), which the ACL cannot exceed.  Amendment 16, § 4.1.2 at 77; 16 U.S.C. 1852(g)(B), (h)(6); 50 CFR 600.310(f)(3), (5).

78.     The purpose of the ABC control rule is to take into account scientific uncertainty when setting ACLs, which will be imposed on the various fisheries, so that ABC limits are not exceeded.  Amendment 16, § 4.1.2 at 78; 50 C.F.R. 600.310(f)(4).

79.     Amendment 16 did not consider any alternatives, apart from the "no action" alternative, in establishing the ABC control rule.  Amendment 16, § 5.1.2 at 174.

80.     In its December 2009 Comment Letter, Oceana commented that the agency should explore a full spectrum of reasonable alternatives to the ABC control rule, with reference to the factors contained in the agency's guidance.  December 2009 Comment Letter at 2-4.

81.     In its December 2009 Comment Letter, Oceana also commented that the agency should consider the probability that the ABC control rule would prevent overfishing on *all* the managed stocks, together with reasonable alternatives for preventing overfishing on all the managed stocks.  *Id.* at 3.

82.     Oceana also commented that the agency should explore alternatives to its choice to use an ABC control rule methodology suitable for "data-poor" stocks, especially given the use of alternative methodologies in other councils.  *Id.*

83.     The agency ignored Oceana's comments.

## AMENDMENT 16 FAILS TO TAKE A HARD LOOK AT THE ENVIRONMENTAL IMPACTS OF INCLUDING OR EXCLUDING STOCKS FROM THE CATCH LIMIT SYSTEM

84.     A central principle in the Fisheries Service's guidance concerning ACL-based management is the concept of stocks "in the fishery," which may include target stocks, non-target stocks, and "Ecosystem Component" species.  50 C.F.R. 600.310(d)(1).

85.     Agency guidance directs the fishery management councils to establish ACLs and accountability measures for stocks in the fishery, but does not require ACLs for stocks that are not "in the fishery."  50 C.F.R. 600.310(h).

86.     This approach places on the agency the responsibility to rationally consider which species and stocks to include in each fishery management plan under the APA, to consider feasible and reasonable alternatives to these choices pursuant to NEPA, and to analyze the environmental impacts of these choices pursuant to NEPA.  Amendment 16 does not meet these requirements.

87.     Amendment 16 added only one species, Atlantic wolffish, to the pre-existing list of managed stocks as stocks in the fishery, restricting the use of ACLs to those stocks only. Amendment 16, § 6.1.7 at 270-71.

88.     The Amendment fails however, to rationally explore the issue of overall catch in the fishery and include a discussion of which stocks will need ACLs, which will not, and why.

89.     Oceana previously raised this issue in its December 2006 and December 2009 Comment Letters.

90.     In its June 2006, February 2009, June 2009, November 2009, and December 2009 Comment Letters, Oceana raised other issues for the agency to consider as part of its NEPA analysis, but the agency ignored its comments.

## FIRST CLAIM FOR RELIEF

91.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 90 in this First Claim for Relief.

92.     The Magnuson-Stevens Act requires that fishery management plans adequately monitor catch, including bycatch. 16 U.S.C. § 1853(a)(5), (11).

93.     The Magnuson-Stevens Act requires that fishery management plans have adequate monitoring to implement accountability measures.  *Id.* § 1853(a)(15).

94.     The Fisheries Service failed to consider standards of performance in Amendment 16 for the use of observers to monitor the groundfish fishery other than referring to the SBRM, which the Fisheries Service itself stated would be inadequate to control overfishing in fisheries with annual catch limits.  As a result, Amendment 16 entirely failed to consider an important aspect of the management scheme which it established.

95.     Accordingly, this Court should find that, by approving Amendment 16, the Fisheries Service violated the Magnuson-Stevens Act and the APA.

## SECOND CLAIM FOR RELIEF

96.     Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 95 in this Second Claim for Relief.

97.     The Magnuson-Stevens Act requires that fishery management plans include "measures to ensure accountability" to ensure that overfishing does not occur in a fishery.  16 U.S.C. § 1853(a)(15).

98.     The Fisheries Service failed to establish adequate accountability measures for sectors in Amendment 16 to prevent continued overfishing of Atlantic halibut, windowpane flounder, SNE/MA winter flounder, ocean pout and Atlantic wolffish.

99.     Accordingly, this Court should find that, by approving Amendment 16, the Fisheries Service violated the Magnuson-Stevens Act and the APA.

### THIRD CLAIM FOR RELIEF

100.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 99 in this Third Claim for Relief.

101.    The Magnuson-Stevens Act requires that fishery management plans include "measures to ensure accountability" to ensure that overfishing does not occur in a fishery.  16 U.S.C. § 1853(a)(15).

102.    The Fisheries Service failed to establish accountability measures in Amendment 16 to prevent continued overfishing of yellowtail flounder in the scallop fishery.

103.    Accordingly, this Court should find that, by approving Amendment 16, the Fisheries Service violated the Magnuson-Stevens Act and the APA.

### FOURTH CLAIM FOR RELIEF

104.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 103 in this Fourth Claim for Relief.

105.    NEPA requires that an EIS discuss in detail alternatives to proposed action.  42 U.S.C.. § 4332(2)(C)(iii).

106.   NEPA also requires that an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *Id.* § 4332(2)(E).

107.   CEQ regulations require that an EIS shall "[r]igorously explore and objectively evaluate *all* reasonable alternatives."  40 C.F.R. § 1502.14(a) (emphasis added).

108.   Amendment 16 only considered one alternative to the ABC control rule, the "no action" alternative.  Amendment 16, § 5.1.2 at 174.

109.   Amendment 16 did not study, develop or describe other reasonable alternatives to the ABC control rule.

110.   The Fisheries Service failed to respond to the comments of Oceana on this issue as set forth in Oceana's December 2009 Comment Letter.

111.   Accordingly, this Court should find that, by approving Amendment 16, the Fisheries Service violated NEPA and the APA.

### FIFTH CLAIM FOR RELIEF

112.   Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 111 in this Fifth Claim for Relief.

113.   NEPA requires that an EIS discuss in detail alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii).

114.   NEPA also requires that an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *Id.* § 4332(2)(E).

115.   CEQ regulations require that an EIS shall "[r]igorously explore and objectively evaluate *all* reasonable alternatives."  40 C.F.R. § 1502.14(a) (emphasis added).

116.    An EIS must examine the direct, indirect and cumulative effects of the proposed action and any identified alternatives thereto. *Id.* § 1502.16. "Effects include ecological (such as effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8.

117.    The Amendment failed to take a hard look, as required by NEPA, at which stocks to include as stocks "in the fishery," and therefore be subject to ACLs, and which stocks to exclude.

118.    Oceana previously raised this issue in its December 2006 and December 2009 Comment Letters.  The Fisheries Service failed to respond to these comments.

119.    Without a full analysis and discussion of the overall catch of the groundfish fishery, including target catch, non-target catch, landing, and discards, and the environmental impact of decisions concerning which stocks are "in the fishery," Amendment 16 fails to comply with NEPA.

120.    In its June 2006, February 2009, June 2009, November 2009, and December 2009 Comment Letters, Oceana raised other issues for the agency to consider as part of its NEPA analysis, but the agency ignored its comments.

121.    Accordingly, this Court should find that, by approving Amendment 16, the Fisheries Service violated NEPA and the APA.

## PRAYERS FOR RELIEF

122.    Oceana requests that the Court enter a declaratory judgment that Amendment 16 violated, in part, the Magnuson-Stevens Act, NEPA and the APA.

123.    Oceana requests that the Court remand Amendment 16, in part, to the Fisheries Service to establish the required catch monitoring system and accountability measures and develop a new NEPA analysis that complies with the Court's order.

124.    Oceana requests that the Court enter an order awarding Oceana its fees, expenses, and costs.

125.    Oceana requests that the Court provide such other and further relief as the Court deems necessary, just, or proper.

DATED this 7th day of May, 2010                Respectfully submitted,

Sara S. Zdeb (D.C. Bar No. 991065)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

Eric B. Rothenberg
John Rousakis
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
(212) 326-2000

**Attorneys for OCEANA, INC.**