## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**OCEANA, INC.,**

    **Plaintiff,**

        **v.**

**GARY LOCKE, in his official capacity as Secretary of the U.S. Department of Commerce, et al.,**

    **Defendants.**

**Civil Action No. 10-744 (JEB)**

## MEMORANDUM OPINION

In recognition of the persistence of overfishing and habitat loss that threaten fish populations off the coasts of the United States, and with the aim of maintaining a balance between conserving fishery resources and promoting the United States fishing industry, Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act of 1976 (MSA), Pub. L. No. 94-265, 90 Stat. 331 (1976) (codified at 16 U.S.C. § 1801 *et seq.*).  The MSA created eight Regional Fishery Management Councils to monitor and oversee multiple fisheries in each region's waters.  16 U.S.C. § 1852.  Among each Council's primary tasks is the development and maintenance of a fishery management plan (FMP) for each fishery under its control.  The MSA imposes content requirements on these FMPs, see id. § 1853(a)(15), which must ultimately be approved by the National Marine Fisheries Service (NMFS), acting on behalf of the U.S. Secretary of Commerce.  Id. § 1854.

This case revolves around Amendment 16 to the New England Fishery Management Council's (NEFMC) Northeast Multispecies FMP.  Among other things, Amendment 16 represents NEFMC's efforts to bring this FMP into compliance with the MSA by establishing

annual catch limits for each species in the Fishery, as well as measures to ensure accountability

with those limits.  Oceana, Inc., a non-profit organization with the mission of protecting and

restoring the world's oceans, challenges NMFS's decision to adopt Amendment 16 under the

Administrative Procedure Act, 5 U.S.C. § 706(2).  Oceana first claims that Amendment 16

violates the MSA in three ways: by failing to establish an adequate system to monitor

compliance with annual catch limits, by failing to establish adequate accountability measures for

five particular species, and by failing to establish accountability measures for the portion of a

sixth species – yellowtail flounder – caught in the separate Scallop Fishery.  Oceana also argues

that, in adopting Amendment 16, NMFS violated the National Environmental Policy Act

(NEPA), 42 U.S.C. § 4321 *et seq.*, by failing both to take a hard look at the environmental

impacts of the Amendment and to consider all reasonable alternatives to one provision, the ABC

Control Rule.

Both sides have now moved for summary judgment.  Although analysis of this dense

administrative record is no simple matter, the Court ultimately finds in favor of Defendants on

each of Plaintiff's claims save one: that Amendment 16 fails to establish adequate accountability

measures for five species.  This violation requires a limited remand.

I.      **Background**

        A.      Statutory Background

                1.      *The Magnuson-Stevens Act*

Most recently amended by the Magnuson-Stevens Fishery Conservation and

Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (2007), the MSA

aims, *inter alia*, to "conserve and manage [U.S.] fishery resources," "promote domestic

commercial and recreational fishing under sound conservation and management principles," and

"provide for the preparation and implementation, in accordance with national standards, of fishery management plans . . . [to] achieve and maintain . . . the optimum yield from each fishery." 16 U.S.C. § 1801(b).  It also establishes eight "Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans." Id.  For the present case, the New England Fishery Management Council is the relevant Council.

Each Council's voting membership is comprised of state and federal officials from the region with "marine fishery management responsibility and expertise," as well as individuals appointed by the Secretary of Commerce who are knowledgeable regarding, *e.g.*, the conservation and management of the fishery resources of the geographical area concerned. Id. §§ 1852(b)(1)-(2).  The primary responsibilities of each Council include:

- "for each fishery under its authority that requires conservation and management, prepar[ing] and submit[ting] to the Secretary (A) a fishery management plan, and (B) amendments to each such that are necessary," id. § 1852(h)(1) (emphases added);

- "conduct[ing] public hearings . . . so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans," id. § 1852(h)(3); and

- "develop[ing] annual catch limits for each of its managed fisheries that may not exceed the fishing level recommendations of its scientific and statistical committee or the peer review process . . . ." Id. § 1852(h)(6) (emphasis added).

To assist each Council in carrying out its responsibilities, the MSA provides for the creation of standing committees of scientists and fishing-industry experts that report periodically on the status and health of fish stocks in each fishery, peer-review new scientific methods for fishery conservation and management, and advise the Council throughout the process of

preparing and amending fishery management plans (FMPs).  See id. §§ 1852(g)(1);

1852(g)(3)(A); 1852(i)(5).

The Council's FMPs and amendments must conform to the "national standards for

fishery conservation and management" established by the MSA, see id. § 1851(a), and must

contain certain required provisions.  See id. § 1853(a).  Two of the MSA's requirements for

FMPs are at the center of the controversy here.  They read as follows:

> Any fishery management plan which is prepared by any Council, or
> by the Secretary, with respect to any fishery, shall – . . .
>
> (11) establish a standardized reporting methodology to assess the
> amount and type of bycatch occurring in the fishery, and include
> conservation and management measures that, to the extent
> practicable and in the following priority – (A) minimize bycatch;
> and (B) minimize the mortality of bycatch which cannot be avoided.
>
> and . . .
>
> (15) establish a mechanism for specifying annual catch limits in the
> plan (including a multiyear plan), implementing regulations, or
> annual specifications, at a level such that overfishing does not occur
> in the fishery, including measures to ensure accountability.

Id. §§ 1853(a)(11), (15) (emphases added).  In addition to the MSA's mandatory national

standards and content requirements, the Secretary has promulgated "advisory guidelines," the

National Standards Guidelines, "which shall not have the force and effect of law," but which the

Regional Councils may use "to assist in the development of fishery management plans."  Id. §

1851(b).  The National Standards Guidelines are codified at 50 C.F.R. §§ 600.305-600.355.

Once prepared, each Council submits proposed FMPs to NMFS, which acts in practice on

behalf of the Secretary of Commerce to "approve, disapprove, or partially approve" the plan or

amendment.  16 U.S.C. § 1854(a)(3); see also Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 210

n.2 (D.D.C. 2005).  In determining whether or not to approve an FMP, NMFS must review it for

consistency with the requirements of the MSA, including the national standards and content

requirements found at §§ 1851(a) and 1853(a), and, following a 60-day public notice-and-comment period, "take into account the information, views, and comments received from interested persons."  16 U.S.C. §§ 1854(a)(1)-(2).

If, upon completing this review, NMFS approves the FMP or amendment, a final rule and one or more implementing regulations are published in the Federal Register.  See id. § 1854(b)(3).  Approved FMP amendments are subject to judicial review for 30 days under the Administrative Procedure Act, 5 U.S.C. § 706.  See id. § 1855(f)(1).

   2. *NEPA*

The National Environmental Policy Act requires federal agencies to consider the environmental impact of "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  The approval of FMPs and amendments to FMPs are considered major Federal actions within the meaning of NEPA.  See, e.g., Conservation Law Foundation v. Mineta, 131 F. Supp. 2d 19 (D.D.C. 2001).  Before NMFS can approve an FMP amendment, NEPA requires the preparation of one of three levels of documentation based on the extent of the project's impact on the environment.  See 40 C.F.R. §§ 1501.4(a)-(b).  Projects that significantly affect the environment require the preparation of the highest, most detailed level of documentation – an Environmental Impact Statement (EIS).  See 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11.

For actions warranting the preparation of an EIS, NEPA requires that the agency consider reasonable alternatives to the proposed action.  An EIS must "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts [of the proposed action] or enhance the quality of the human environment."  Id. § 1502.1.  To meet this requirement, in its EIS an agency must, *inter alia*, "[r]igorously explore and objectively evaluate all reasonable alternatives" to its chosen action.  Id. § 1502.14(a).

A court may review an agency's failure to comply with NEPA under § 706 of the APA.

See Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 90 (1983).

      B.     Amendment 16

NEFMC oversees nine separate fisheries, each dealing with one or more different species. One of these is the Northeast Multispecies Fishery (also called the "Groundfish Fishery" after the types of fish dwelling there), which consists of 13 species divided into 20 stocks that live in the waters off New England and the Mid-Atlantic states. A "stock" of fish means "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit." 16 U.S.C. § 1802(42). Like each of the nine NEFMC fisheries, the Multispecies Fishery has its own FMP. A brief history of the Multispecies FMP, its amendments, and previous litigation over them is worth describing here.

The Multispecies FMP was initially prepared by NEFMC in 1985. See 1985 Multispecies FMP (available at: http://www.nefmc.org/nemulti/fmp/gf_fmp.html (last visited 12/13/2011)). In 1994, NMFS approved Amendment 5 to the FMP, which instituted the days-at-sea (DAS) effort-control program. See SBRM Am., § 2.8 (Description of Northeast Multispecies FMP) (AR 78 at 6942). The DAS program is an "input-based" management system, meaning it limits the amount of time vessels spend fishing – i.e., their "efforts" to catch fish. The program aims to reduce overfishing by limiting the number of days per year that fishing vessels may operate in the area of the fishery. See Def. Mot. at 56; Am. 16 Record of Decision at 16 (AR 889 at 52110). For the next ten years, NEFMC and NMFS sought to combat dwindling fish stocks through a series of reductions in the number of days permitted at sea. Record of Decision at 16 (AR 889 at 52095); see generally Am. 16, § 3.1 (Brief History of Prior Management Actions) (AR 773 at 47809-12).

In 2004, NMFS implemented Amendment 13, which established the "sector" program as an alternative fishery-management regime to the DAS program.  See Am. 13 Final Rule, 69 Fed. Reg. 22,906 (Apr. 27, 2004).  Beginning with Amendment 13, fishing vessels could join "sectors," which are "temporary, voluntary, fluid associations of vessels."  Am. 16 Final Rule, 75 Fed. Reg. 18,262, 18,275 (Apr. 9, 2010) (AR 997 at 56499).  Fishermen who opt not to join a sector may continue to fish as part of the "common pool."  See Am. 16, § 4.2.3.1 (AR 773 at 47855).  Fishermen who do join sectors "voluntarily agree to abide by certain fishing restrictions and work together to manage an annual allocation of fish."  Plf. Reply at 8 n.7 (citing NOAA Fisheries Service Fact Sheet, Answers to Commonly Asked Sector Management Questions 1 (2009), http://www.nero.noaa.gov/sfd/sectordocs/Sector%20Management%20Fact%20Sheet%20 Aug%2009.pdf).  In exchange, participation in a sector exempts fishermen from many of the Fishery's input controls, such as the DAS program.  Removing DAS limits while requiring sector vessels to adhere to fishing quotas represents a shift in management strategy from an "input-based" system to an "output-based" system.  See Am. 16 Final Rule, 75 Fed. Reg. at 18,276 (AR 997 at 56500).  The latter hinges not on fishing efforts, but on results – i.e., the amount of fish caught, which represents each vessel's fishing "output."  This shift in strategy is significant for the Court's purposes because it requires changes in the manner in which overfishing is monitored.

In addition to introducing the sector program, Amendment 13 sought to bring the Multispecies FMP into compliance with MSA § 1853(a)(11)'s requirement that all FMPs contain a standardized bycatch reporting methodology.  The term "'bycatch' means fish which are harvested in a fishery, but which are not sold or kept for personal use" – i.e., discarded fish.  16 U.S.C. § 1802(2).  As with Amendment 9 before it, however, another court in this district held

that Amendment 13 failed to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery," as required by § 1853(a)(11). See Oceana, Inc. v. Evans, No. 04-811, 2005 WL 555416, at *43 n.36 (D.D.C. Mar. 9, 2005) (remanding portion of Amendment 13 concerning bycatch reporting methodology); Conservation Law Foundation v. Evans, 209 F. Supp. 2d 1, 13 (D.D.C. 2001) (holding Amendment 9 and Framework 33 failed to establish required bycatch reporting methodology).

In response to these rulings, in 2007, NMFS approved the Northeast Region Standardized Bycatch Reporting Methdology (SBRM) Amendment. AR 78. The SBRM Amendment is an omnibus amendment to the fishery management plans of the Mid-Atlantic and New England Regional Fishery Management Councils and constitutes Amendment 15 to the Multispecies FMP. See SBRM Am. at i (AR 78 at 6891-93). NMFS published the final rule implementing the SBRM Amendment in January 2008. See SBRM Am. Final Rule, 73 Fed.Reg. 4,736 (Jan. 28, 2008).

The methodology described in the SBRM Amendment consists of data-collection procedures coupled with analyses and statistical tools used to estimate bycatch in a fishery. See SBRM Am., § 5.1 (AR 78 at 7033). The SBRM Amendment's data-collection procedures are most relevant to this case. To collect the necessary data to accurately monitor bycatch, NMFS relies primarily on the Northeast Fisheries Observer Program (NEFOP), through which government-funded on-board observers monitor the bycatch discards of fishing vessels at sea. Id., § 4.5 (AR 78 at 7009). Observers are allocated to vessels at the level necessary to ensure sufficient data is collected to meet the SBRM's performance standard. Id., § 6.2.3 (AR 78 at 7099). This standard is expressed in terms of statistical precision: bycatch estimates must be "sufficient to attain a [coefficient of variation (CV)] of no more than 30 percent." Id., § 6.3.2

(AR 78 at 7110).  The 30% CV standard is designed "to ensure that the bycatch-related data collected under the SBRM and utilized in stock assessments and management is adequate for those tasks."  Id. (AR 78 at 7109).

Oceana challenged the SBRM Amendment under the APA in this district in Civil Action No. 08-318 (Feb. 25, 2008).  On July 23, 2010, Judge Ellen Huvelle upheld the SBRM Amendment, including its 30% CV performance standard, finding that "the agency's actions in developing and approving the Amendment were reasonable and in accordance with the law." Oceana, Inc. v. Locke, 725 F. Supp. 2d 46, 72 (D.D.C. 2010).  On July 19, 2011, the D.C. Circuit reversed Judge Huvelle's ruling and remanded the case back to her for the purpose of vacating the SBRM Amendment and remanding it to NMFS.  Oceana, Inc. v. Locke, No. 10-5299, 2011 WL 2802989, at *5 (D.C. Cir. July 19, 2011).  The D.C. Circuit based its ruling, however, on a provision in the Amendment rendering the SBRM non-binding on NMFS "'[i]n any year in which external operational constraints would prevent the [agency] from fully implementing the required at-sea observer coverage levels.'"  Id. at *2 (quoting 73 Fed. Reg. 4736, 4738 (Jan. 28, 2008)).  Finding that this exception to the SBRM "grants the Fisheries Service substantial discretion both to invoke and to make [observer] allocations according to a non-standardized procedure," the court "h[e]ld that the Service did not 'establish' a standardized methodology under the Fisheries Act."  Id. at *5.  The D.C. Circuit did not otherwise reach the merits of the SBRM Amendment's bycatch-reporting methodology.  On September 15, 2011, Judge Huvelle vacated the SBRM Amendment and remanded the case to NMFS "for further proceedings consistent with the opinion of the Court of Appeals."  Oceana v. Locke, No. 08-318 (D.D.C. Sept. 15, 2011) (Order).

While the litigation over the SBRM Amendment was pending, NEFMC proposed and NMFS adopted Amendment 16 to the Multispecies FMP.  In doing so, NEFMC sought to comply with the 2007 amendments to the Magnuson-Stevens Act, as well as the continuing dilemma of overfishing in the fishery, by making three major changes to the Multispecies FMP. First, Amendment 16 reduces the total number of days-at-sea allocated to common-pool vessels by 32% from 2009.  AR 961 at 56142.  Second, Amendment 16 expands the sector program and requires that each sector adhere to a hard total allowable catch (TAC), also called an "annual catch entitlement" (ACE), for each stock in the fishery.  Am. 16 Final Rule 75 Fed. Reg. at 18,276 (AR 997 at 56500).  In the wake of this expansion, more than 55% of federal permit holders, who conduct more than 98% of the fishing taking place in the Multispecies Fishery, have joined sectors.  See Sector Operations Final Rule, 75 Fed. Reg. 18,113, 18,114 (Apr. 9, 2010) (AR 996 at 56466); AR 961 at 56170; AR 967 at 56258.  Third and most important for the instant case, Amendment 16 attempts to satisfy § 1853(a)(15)'s requirement that FMPs "establish a mechanism for specifying annual catch limits [ACLs] . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability" with those limits.  Id.; see Am. 16 Final Rule, 75 Fed. Reg. at 18,266-71) (AR 997 at 56490-95). Such measures are referred to as "accountability measures" or "AMs."  It is Amendment 16's mechanism for monitoring compliance with ACLs and its alleged lack of AMs for certain species that Plaintiff challenges in the present suit.

NMFS implemented Amendment 16 through the adoption of three sets of regulations: the Amendment 16 Final Rule, 75 Fed. Reg. 18,262 (Apr. 9, 2010) (AR 997), codified at 50 C.F.R § 648, which implements Amendment 16 itself; the Sector Operations Final Rule, 75 Fed. Reg. 18,113 (Apr. 9, 2010) (AR 996), which approves 17 sector-operations plans for FY 2010s; and

Framework Adjustment 44, 75 Fed. Reg. 18,356 (Apr. 9, 2010) (AR 1001).  A framework adjustment is an abbreviated administrative procedure that may be used in certain situations to modify or update an FMP without completing the full amendment process.  See 50 C.F.R. § 648.90.  Framework Adjustment 44 sets the specific catch limits for FY 2010 to FY 2012 using the process defined by Amendment 16.  75 Fed. Reg. 18,113 (AR 1001).

Amendment 16 has already survived challenges under the Magnuson-Stevens Act and NEPA in the U.S. District Court for the District of Massachusetts.  See City of New Bedford v. Locke, No. 10-10789, 2011 WL 2636863 (D. Mass. June 30, 2011) (Order granting Agency's Motion for Summary Judgment and denying Plaintiffs' Motion for Summary Judgment).  A group of plaintiffs led by the City of New Bedford, Massachusetts, challenged Amendment 16 on a number of issues not disputed here.  Most relevant to this case were New Bedford's assertions that Amendment 16's "ACLs for some stocks are overly conservative," and that NFMS failed to consider a particular alternative action favored by the plaintiffs in violation of NEPA.  Id. at *7-9.  In other words, while Oceana here maintains Amendment 16 is not sufficiently restrictive, the plaintiffs there argued the opposite.

Judge Rya Zobel found Amendment 16's ACLs to be reasonable: "The Agency decided upon the A16 ACL methodology after a reasoned and scientifically grounded process, including the Groundfish Assessment Review Meeting, a year-long effort by at least 18 fishery scientists to assess the health of groundfish stocks.  . . .  The ACLs are not arbitrary."  Id. at *7 (citing AR 773 at 47831-42; AR 320 (GARM III Report); AR 615 (recommendations of Scientific and Statistical Committee)).  Regarding New Bedford's NEPA claim, Judge Zobel found the Agency's decision to defer consideration of the alternative identified by the plaintiffs to a future

Amendment 17 of the Multispecies FMP to be permissible, particularly in light of the MSA's time constraints for ending overfishing and instituting plans to rebuild the Fishery.  Id. at *9.

C.      The Current Action

Plaintiff Oceana is "a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education."  Compl., ¶ 23.  Although headquartered in Washington, D.C., Oceana claims "6,000 members in the coastal states from Maine to Florida," who "use and enjoy the oceans for numerous [recreational and commercial] activities" and "consume seafood."  Id., ¶¶ 23-24.  Its members are harmed, Oceana alleges, by "unsustainable fishing practices in Northeast fisheries" generally and by "the Fisheries Service's failure to establish adequate catch monitoring systems and accountability measures" in particular.  Id., ¶¶ 24-25.

On May 7, 2010, Oceana filed this action for Declaratory and Injunctive Relief against Secretary of Commerce Gary Locke; the National Oceanic and Atmospheric Administration (NOAA), a scientific agency within the Department of Commerce; and the National Marine Fisheries Service (NMFS), a division of NOAA.  (The Court at times refers to Defendants collectively as "NMFS.")  In its Complaint, Plaintiff alleges that Amendment 16 violates the APA by failing to comply with the Magnuson-Stevens Act in three ways: (1) by "us[ing] an inadequate performance standard for monitoring bycatch," (2) by "fail[ing] to establish accountability measures for a number of species subject to catch limits," and (3) by "fail[ing] to establish accountability measures for yellowtail flounder caught in the scallop fishery."  Compl. at 12, 15, 16.  Plaintiff further alleges that the Amendment violates the APA by failing to comply with NEPA in two ways: (1) by "fail[ing] to take a hard look at the environmental impacts of including or excluding stocks from the catch limit system," and (2) by "fail[ing] to consider any alternatives to the ABC Control Rule other than the no action alternative."  Id. at 17-18.  It seeks

to "compel the Fisheries Service to establish an adequate management system to enforce annual

catch limits, including a bycatch monitoring system sufficient to provide the catch data needed to

enforce catch limits, and the required accountability measures to reduce the amount of

groundfish caught as bycatch in the New England fisheries, so that overfishing is prevented and

those overfished stocks can be rebuilt, as required by law." Id., ¶ 16.

On March 11, 2011, Oceana moved for summary judgment on each of its claims. On

April 15, 2011, NMFS cross-moved for summary judgment. The Court now considers these

Motions.

## II.   Legal Standard

Although styled Motions for Summary Judgment, the pleadings in this case more

accurately seek the Court's review of an administrative decision. Final agency decisions under

the Magnuson-Stevens Act and NEPA are reviewed under the standard set forth by the APA.

See Oceana, Inc. v. Locke, 725 F. Supp. 2d 46, 53 (D.D.C. 2010), rev'd on other grounds, No.

10-5299, 2011 WL 2802989 (D.C. Cir. July 19, 2011) (citing 16 U.S.C. § 1855(f)(1)(B)

(reviewing court may set aside challenged regulation or action based only on grounds specified

in 5 U.S.C. § 706(2)). In such a case, summary judgment merely serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review. See Richards v. INS, 554 F.2d 1173,

1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002),

aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

The APA "sets forth the full extent of judicial authority to review executive agency

action for procedural correctness." F.C.C. v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1810

(2009). It requires courts to "hold unlawful and set aside agency action, findings, and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Under this "narrow" standard of review, "a court is not to substitute its judgment for that of the agency," Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983), and "will defer to the [agency's] interpretation of what [a statute] requires so long as it is 'rational and supported by the record." Oceana, Inc. v. Locke, 2011 WL 2802989, at *2 (D.C. Cir. July 19, 2011) (quoting C & W Fishing Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1994)).

An agency is nonetheless required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation omitted).  The reviewing court thus "may not supply a reasoned basis for the agency's action that the agency itself has not given." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (internal quotation omitted).  Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." Id. at 286.  The Court should focus its review on the administrative record.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Under NEPA, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Baltimore Gas and Elec. Co., 462 U.S. at 97-98; see also Nevada v. Dep't of Energy, 457 F.3d 78, 87-88 (D.C. Cir. 2006) (applying APA's arbitrary and capricious standard "to review both the agency's procedural compliance with NEPA and the adequacy of an EIS").

### III.   Analysis

As a preliminary matter, Plaintiff asserts – and Defendants do not dispute – that Oceana has standing to bring this lawsuit.  Because this point is uncontested and other courts in this Circuit have without pause reached the merits of Oceana's claims challenging FMP Amendments and NMFS regulations in other cases, this Court will do the same.  See, e.g., Oceana, Inc. v. Locke, No. 10-5299, 2011 WL 2802989 (D.C. Cir. July 19, 2011); Oceana, Inc. v. Evans, No. 04-811, 2005 WL 555416 (D.D.C. Mar. 9, 2005); Oceana, Inc. v. Evans, 384 F. Supp. 2d 203 (D.D.C. 2005).

In proceeding to the merits, the Court will first evaluate Plaintiff's claims under the Magnuson-Stevens Act and then move to consider the effect of NEPA.

### A.   The Magnuson-Stevens Act

Oceana asserts three bases for its claim that Amendment 16 violates the MSA, all arising from that statute's requirement that FMPs shall "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  16 U.S.C. § 1853(a)(15).  Oceana does not dispute that Amendment 16 establishes a mechanism for specifying ACLs; indeed, Amendment 16 establishes a mechanism for setting an ACL for each stock, a sub-ACL in each stock for sector vessels generally, and an "annual catch entitlement" (ACE) of each stock for each particular sector of vessels.  See Am. 16, §§ 4.2.1, 4.2.1.2, 4.2.1.3, 4.2.3 (AR 773 at 47843-54).  Rather, Plaintiff challenges the mechanisms Amendment 16 establishes to monitor compliance with, and ultimately ensure accountability with, those ACLs.  The Court will consider each of Oceana's three challenges in turn.

1.    *Bycatch Monitoring*

Oceana first challenges Amendment 16's provisions relating to bycatch monitoring.  It

argues that Amendment 16 fails to comply with two subsections of the MSA, § 1853(a)(15) and

§ 1853(a)(11).  Subsection (a)(15) requires that FMPs (and their amendments) establish

"measures to ensure accountability" with annual catch limits.  Subsection (a)(11) requires FMPs

to "establish a standardized reporting methodology to assess the amount and type of bycatch

occurring in the fishery."  Though both parties agree that bycatch must be accurately monitored

before ACLs can be enforced, see Plf. Mot. at 2; Def. Mot. at 12, Oceana interprets the MSA as

requiring FMPs to include a bycatch-reporting methodology (as required by § (a)(11)) capable of

monitoring compliance with ACLs (as required by § (a)(15)).  See Plf. Mot. at 2-3.  Amendment

16, Plaintiff contends, fails to establish such a methodology and, for this reason, violates both §

(a)(15) and § (a)(11).  See id. at 17-21.

NMFS responds that Oceana's interpretation improperly fuses and conflates two

independent statutory requirements – § (a)(15)'s requirement that FMPs establish measures to

ensure accountability with ACLs, and § (a)(11)'s requirement that they establish a standardized

bycatch-reporting methodology.  See Def. Mot. at 20-22.  In doing so, the Agency asserts,

Oceana would have the Court hold Amendment 16 to a higher standard than is required by the

MSA.  Unlike § (a)(11), NMFS contends, § (a)(15) does not require the inclusion of a bycatch-

reporting methodology in the FMP.  When evaluated under the proper statutory framework,

NMFS argues, Amendment 16's bycatch-monitoring provisions are sufficient.  See id. at 21.

To address the parties' arguments, the Court must first determine what the MSA requires

and then evaluate whether Amendment 16 complies.  Because the Court concludes that § (a)(15)

and § (a)(11) impose two distinct requirements, as opposed to one fused mandate, the Court must

also decide whether Amendment 16 complies with each of these subsections separately.  The

Court ultimately holds that Amendment 16 satisfies § (a)(15) with respect to bycatch monitoring. For the reasons explained below, the Court will not reach Oceana's § (a)(11) challenge.

a. Relationship Between § (a)(15) and § (a)(11)

In reviewing an agency's interpretation of a statute it administers, the Court follows the two-step analytical framework established by <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984); <u>see also</u> <u>Shays v. Federal Election Comm'n</u>, 414 F.3d 76, 96 (D.C. Cir. 2005). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842–43. If the statute is ambiguous, however, the Court must uphold the Agency's interpretation if it is "based on a permissible construction of the statute." <u>Id.</u> at 843. Only if the Agency's interpretation is unreasonable will the Court reject it.

To divine the will of Congress on the statutory interplay between § (a)(15) and § (a)(11) is quite difficult. The next step, therefore, is to analyze whether Defendants' interpretation is reasonable. They are initially correct that the language of § 1853(a)(15) itself does not compel the interpretation urged by Oceana – *i.e.*, that the MSA requires FMPs to include a bycatch-reporting methodology for the purpose of ensuring accountability with ACLs. While, as a practical matter, the volume of a fishery's total annual catch is inextricably linked to the amount of its bycatch, the statutory text does not require that FMPs include a bycatch-reporting methodology designed to do the work of monitoring and enforcing ACLs. As Defendants correctly observe, "[N]othing in the Act requires the 'standardized reporting methodology' to be the mechanism used to 'ensure accountability' with annual catch limits." Def. Mot. at 22. In fact, § 1853(a)(15) "does not [even] mention bycatch." <u>Id.</u> at 21.

NMFS's interpretation is also bolstered by a textual comparison of § (a)(15) with the other subsections of § 1853. When Congress added § (a)(15) to the MSA in 2007, it chose to use different language to describe the requirement imposed by this subsection as compared to § (a)(11). The Supreme Court recognizes the "general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452 (2002) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)). Courts should therefore "refrain from concluding . . . that the differing language in two subsections has the same meaning in each." Russello, 464 U.S. at 23. Here, Congress added the § (a)(15) accountability-"measures" requirement after multiple courts had interpreted what was intended by § (a)(11)'s standardized-reporting-"methodology" requirement, see Conservation Law Foundation, 209 F. Supp. 2d 1; Oceana, Inc., 2005 WL 555416; Oceana, Inc. v. Evans, 384 F. Supp. 2d 203 (D.D.C. 2005), and opted to use a different word to describe what FMPs must establish with respect to AMs. What § (a)(15) requires to establish "measures" need not be the same as what § (a)(11) requires for the establishment of a "methodology." Given the statute's plain meaning and Congress' choice of different language for the two subsections, the Court cannot conclude, based on the statute's text, that by requiring FMPs to "establish . . . measures to ensure accountability" with annual catch limits, § (a)(15) implicitly requires that they also establish a bycatch-reporting methodology to help carry out this task.

Neither does a more holistic review of the MSA support Oceana's interpretation. NMFS observes – reasonably, in the Court's opinion – that §§ (a)(11) and (a)(15) impose "two distinct requirements" on FMPs and serve "different purposes." Def. Mot. at 21. Subsection (a)(11)

mandates the assessment of the "amount and type of bycatch occurring in the fishery" for the

purpose of creating "conservation and management measures that, to the extent practicable . . .

minimize bycatch [and] the mortality of bycatch which cannot be avoided."  Subsection (a)(15),

on the other hand, requires the establishment of "measures to ensure accountability" with annual

catch limits.  The methodology prescribed by the SBRM Amendment, which was designed to

carry out the requirements of § (a)(11), produces annual fishery-wide assessments of bycatch that

benefit from high-quality data gathered over a long period of time.  See SBRM Am., § 1.7 (AR

78 at 6925); 73 Fed. Reg. at 4738.  ACL monitoring, on the other hand, requires in-season

bycatch reports that measure discards in near real time and therefore work with a larger amount

of missing and unaudited data.  See AR 932 at 55347.  ACL monitoring also requires more

specific measurements that report bycatch for each stock by sector (to monitor ACEs) rather than

for the Fishery as a whole.  See AR 678 at 46075.  Despite the underlying fact that bycatch

monitoring is required to comply with both §§ (a)(11) and (a)(15), NMFS is correct to urge the

Court to resist the temptation to "fus[e] these two distinct requirements into a new obligation that

is not actually part of the Act."  Def. Mot. at 21.

        In light of this statutory review, the Court finds that § (a)(15) is at least ambiguous and

is persuaded that NMFS's interpretation is a reasonable one.  Nothing in the statute's text

compels the conclusion that the "measures to ensure accountability" with ACLs required by §

(a)(15) must also, by themselves, meet the requirements of § (a)(11).  While it may be more

efficient, from a regulatory perspective, for NEFMC and NMFS to develop one bycatch-

reporting methodology capable of both satisfying § (a)(11) and monitoring compliance with the

ACLs established in accordance with § (a)(15), it is not the Court's role to impose such a policy

approach on the Agency.  The Court, accordingly, agrees with NMFS that the FMP (including its

amendments) is sufficient so long as it independently complies with §§ (a)(15) and (a)(11).  This, however, is merely the first step in the analysis.  Oceana still contests Amendment 16's independent compliance, which is where the Court now turns its focus.

b.   Compliance with § (a)(15)

Although § (a)(15) does not require the FMP to include a bycatch-reporting methodology, both parties agree that bycatch must be accurately monitored and reported.  Put another way, in order to ensure accountability with annual catch limits, NMFS must accurately monitor catch during the fishing season.  "Catch" includes both fish that are retained and fish that are discarded – *i.e.*, bycatch.  50 C.F.R. § 600.310(f)(2)(i).  NMFS agrees: "[B]ecause the Act now requires the Council and NMFS to set annual catch limits for these stocks, and because bycatch counts against those catch limits, the total amount of bycatch must be accurately assessed to ensure that catch limits are not exceeded."  Def. Mot. at 12.

Oceana contends that Amendment 16 does not require bycatch monitoring – specifically, allocation of at-sea observers to fishing vessels – at a level higher than that required under the SBRM Amendment. Plf. Reply at 4.  It argues further that this level of monitoring was not designed for use in a quota-based fishery management system and is thus inadequate to monitor compliance with ACLs, as is required by § (a)(15).  Plf. Mot. at 17-18.

NMFS does not dispute that the SBRM Amendment is inadequate in the observer-coverage levels it requires to measure bycatch at the level necessary to accurately monitor and enforce ACLs.  See Def. Mot. at 18 (NMFS has "stat[ed] that the 'use of the SBRM for quota monitoring needs is not appropriate' and  . . . 'determined that higher levels of coverage are necessary to meet this need and to allow accurate extrapolations of discards.") (quoting AR 678 at 46076).  NMFS insists, however, that it did not simply adopt the SBRM Amendment's approach to setting observer-coverage levels when drafting Amendment 16.  Def. Mot. at 18.  On

the contrary, Defendants maintain, Amendment 16 requires higher levels of observer coverage than the SBRM Amendment and, accordingly, provides for a level of bycatch monitoring sufficient to track compliance with ACLs.

In so contending, NMFS first asserts that Amendment 16 requires deployment of at-sea observers at three to four times the level required under the SBRM Amendment.  Def. Mot. at 14; see also Def. Reply at 1-2.[1]  Specifically, Defendants argue that Amendment 16 increased observer coverage from the 7-8% required by the SBRM Amendment to 30% for vessels fishing in the common pool and 38% for vessels participating in sectors.  Def. Mot. at 16 (citing Am. 16 Final Rule, 75 Fed. Reg. at 18,272, 18,297 (AR 997 at 56496,56521); Record of Decision at 33 (AR 889 at 52112); AR 649 at 45357, 45449); Def. Reply at 1-2.  In this they are simply wrong.

The 30% and 38% coverage levels appear nowhere in Amendment 16 and are not in fact specifically required by the FMP.  The only rule or regulation NMFS cites in support of such a requirement is the preamble to the Final Rule implementing Amendment 16.  See 75 Fed. Reg. at 18272 (AR 997 at 56496).  The Agency also mentions these figures in the section of the Final Rule addressing public comments on the regulation.  Id. at 18,297 (AR 997 at 56521).  As another court in this district has observed, § 1853(a) describes the required contents of FMPs and is not satisfied when required provisions appear only in rules or regulations promulgated by NMFS.  See Oceana, Inc. v. Evans, 2005 WL 555416, at *40 (rejecting argument that mandatory provision of FMP may be created by Secretary acting alone outside Amendment process).

But even if a requirement contained only in the preamble to an implementing regulation could satisfy § (a)(15), the preamble merely states: "NMFS has received sufficient funding to

---

[1] Although Defendants initially suggested that NMFS increased the level of at-sea monitoring in the Multispecies FMP to six times the level required by the SBRM Amendment, they make clear in their Reply that this calculation was based on an error in establishing the baseline coverage level under the SBRM Amendment as 5%, when in fact it has been 7%-8%.  See Def. Reply at 1-2.  As the difference does not affect the Court's analysis, it will not dwell on the mistake.

increase observer coverage in the NE multispecies fishery for FY 2010, with additional funding possibly available in future years.  At this time, funding is available to observe up to 30 percent of common pool trips, and up to 38 percent of sector trips."  75 Fed. Reg. at 18272; AR 997 at 56496.  The present availability of funding for, and a future mandate for, coverage at particular levels are not the same thing.  See Oceana, Inc. v. Locke, 2011 WL 2802989, at *5.  The funding, moreover, is available "up to" the stated percentages.  Although NMFS may intend to enforce observer-coverage levels of 30% and 38%, may actually be enforcing such coverage now, and may hope to have the funding to continue to do so in future years, nothing in Amendment 16 or the Final Rule requires such action.  "At best the rule sets a benchmark from which the agency freely can . . . depart in its annual allocation of observers."  Id.; see also Oceana, Inc. v. Evans, 2005 WL 555416, at *40 ("insofar as Amendment 13's language indicates only an 'intent' to implement an adequate program, it fails to comply with governing law, because defendants' intent could change at any time").  Although sectors will assume the burden of funding observers in FY 2012, see Am. 16, § 4.2.3.5.3 (AR 773 at 47864); 75 Fed. Reg. at 18,278 (AR 997 at 56502), nothing in Amendment 16 or its implementing regulations indicates that 30%/38% coverage will be required by law.

While Amendment 16's implementing regulations do require that bycatch monitoring "must be sufficient to at least meet the coefficient of variation specified in the Standardized Bycatch Reporting Methodology and accurately monitor sector operations," 50 C.F.R. § 648.87(b)(1)(v)(B)(3)(ii) (emphasis added), NMFS's suggestion that these implementing regulations, let alone the Amendment, mandate coverage for a specified percentage of fishing trips is not factually accurate.

Fortunately for NMFS, the analysis does not end here.  Even when establishing a bycatch-reporting methodology under § (a)(11), an FMP need not necessarily mandate a specific level of observer coverage.  See Oceana, Inc. v. Evans, 384 F. Supp. 2d at 234 n.38.  And as established above, all the Multispecies FMP must do to satisfy § (a)(15) is require bycatch monitoring adequate to support measures to ensure accountability with ACLs.  Although Amendment 16 does not require observer coverage of 30% for the common pool and 38% for the sectors, it does require that bycatch be accurately reported throughout the fishing season at levels such that ACLs can be monitored and enforced.  As the Court now explains, this is sufficient.

Multiple provisions of Amendment 16 address the need for – and require – adequate bycatch monitoring for sector vessels, which catch 98% of the fish.  For example, Amendment 16 requires that each sector obtain Agency approval of an operation plan that "specif[ies] how [the] sector will monitor its catch to assure that sector catch does not exceed the sector allocation."  Am. 16, § 4.2.3.5.3 (AR 773 at 47864).  The Amendment further specifies that the fishing "industry will be responsible for the development of and costs associated with a program, including an observer program that will satisfy the monitoring rules."  Id. at 47864.  To meet this requirement, each sector must develop and fund "an adequate at-sea monitoring program so that each sector's discards can be determined."  Id. at 47866.  To obtain approval, sectors must be able to "demonstrate to NMFS that discards can be accurately monitored and counted as part of the ACE, at the sector's expense, by FY 2012."  Id. at 47866.

Notably, this program does not replace the government-funded Northeast Fisheries Observer Program utilized by the SBRM Amendment, but rather supplements it, reflecting the Agency's awareness that additional observation would be necessary to enforce a quota-based

fishery management system for the sectors.  Id. at 47865.  With respect to observer-coverage

levels, Amendment 16 provides:

> For observer or at-sea monitor coverage, minimum coverage levels
> must meet the coefficient of variation in the [SBRM Amendment].
> The required levels of coverage will be set by NMFS based on
> information provided by the Northeast Fisheries Science Center
> (NEFSC) and may consider factors other than the SBRM CV
> standard when determining appropriate levels.

Id. at 47865.  NMFS correctly contends these requirements satisfy any bycatch-monitoring

content requirement suggested by § 1853(a)(15).

Oceana responds that Amendment 16's observer-coverage-level provisions are flawed

because they do not mandate a coverage level above that in the SBRM Amendment.  To the

extent Amendment 16 requires accurate bycatch monitoring in the sectors, Plaintiff argues, the

requirement is "so vague as to be meaningless."  Plf. Supp. Resp. at 3 (citing Oceana, Inc. v.

Locke, 2011 WL 2802989, at *3).  The Court disagrees, concluding that Amendment 16's

bycatch-monitoring provisions are both mandatory and sufficiently specific.[2]

First, the provisions are mandatory inasmuch as the sector-run bycatch-monitoring

programs required by Amendment 16 must dispatch observers at the annual levels set by NMFS.

 Am. 16, § 4.2.3.5.3 (AR 773 at 47865).  While observer-coverage levels must at least be

sufficient to produce data that meets the precision standard established by the SBRM

Amendment, NMFS makes an independent determination of the "appropriate levels"  "based on

information provided by the Northeast Fisheries Science Center."  Id. at 47865.  This

requirement reflects the MSA's National Standard No. 2, which requires that "[c]onservation and

---

[2] The parties wage this battle over the language of Amendment 16's implementing regulation, which states: "[C]overage levels must be sufficient to at least meet the coefficient of variation specified in the Standardized Bycatch Reporting Methodology and accurately monitor sector operations."  50 C.F.R. § 648.87(b)(1)(v)(B)(3)(ii) (emphasis added).  As § 1853(a)(15) addresses content requirements for FMPs rather than NMFS's regulations, the relevant inquiry is whether Amendment 16 itself complies.  See Oceana v. Evans, 2005 WL 555416, at *40.  The parties' arguments nevertheless apply equally to corresponding provisions in Amendment 16.

management measures shall be based upon the best scientific information available."  §

1851(a)(2).  While Amendment 16 does not include the phrase "and accurately monitor sector

operations," which is contained in the implementing regulation, see 50 C.F.R. §

648.87(b)(1)(v)(B)(3)(ii), the Council's intent to include such a requirement is clear from the

sections of Amendment 16 described above.  NMFS's understanding of Amendment 16 as

including such a requirement, which bears on the arbitrariness of the Agency's decision to

approve Amendment 16, is supported by the language of the implementing regulation.

Observers dispatched as part of the sector-run bycatch-monitoring program, moreover,

increase the total levels of observer coverage for sector vessels over the levels established by the

SBRM Amendment.  This is because the "industry-funded observer or at-sea monitoring

program will not replace the NMFS Observer Program," but rather works in conjunction with it.

 Am. 16, § 4.2.3.5.3 (AR 773 at 47865).   While Amendment 16 thus no doubt reserves to the

Agency significant discretion to determine, on a year-to-year basis, what level of observer

coverage is necessary to accurately monitor bycatch in the sectors, the record supports NMFS's

contention that Amendment 16 does not permit the Agency to merely default to the levels

established by the SBRM Amendment if such levels are determined to produce scientifically

inadequate data.

The Court further finds that Amendment 16's bycatch-monitoring provisions are

sufficiently specific to satisfy § (a)(15).  The Amendment admittedly provides few details

regarding exactly how appropriate observer-coverage levels will be determined and would

therefore be insufficient to describe a standardized reporting methodology as required by §

(a)(11).  See Oceana, Inc. v. Evans, 384 F. Supp. 2d at 234.  Section (a)(15), however, does not

even mention bycatch monitoring, which, in the context of that MSA subsection, serves merely

as the means to an end.  Amendment 16 is sufficiently detailed for the task at hand: establishing the bycatch measurements implicitly needed to support the system of ACLs and AMs that § (a)(15) requires.

Oceana's assertion that the D.C. Circuit's recent opinion in Oceana, Inc. v. Locke, No. 10-5299, dictates a contrary outcome is unpersuasive.  In that case, the D.C. Circuit evaluated an exemption in a regulatory provision that granted the Agency discretion to determine whether to comply with a provision required by the MSA rather than, as is the case here, how to comply. See id., 2011 WL 2802989 at *2-3.  Evaluating the SBRM Amendment's "external operational constraint" provision, the court "considered the limits upon an agency's authority to reserve in advance some discretion to depart on a case-by-case basis from an otherwise applicable rule." Id. at *3.  Applying the rule that in such a case, the "agency must adequately define the circumstances that 'trigger' the case-by-case analysis, . . . and [] must set an 'identifiable standard' to guide its judgment when operating under that procedure," the court found that "external operational constraints, such as funding shortfalls" was an impermissibly vague trigger that gave the Agency too much discretion to apply – or not apply – the SBRM Amendment's standardized bycatch-reporting methodology in any given year.  Id., at *2-4 (quoting Cement Kiln Recycling Coalition v. EPA, 493 F.3d 207, 217-23 (D.C. Cir. 2007)).  The vagueness of the trigger, the court found, rendered the SBRM non-mandatory – and thus failed to establish such a methodology as required by § 1853(a)(11).  Amendment 16 does not include an escape clause of the type the D.C. Circuit found objectionable in the SBRM Amendment, and this is not the effect of the discretion reserved to the Agency by Amendment 16's bycatch-monitoring provisions.

As a result, in light of the deference owed to NFMS under <u>Chevron</u>, the Court finds that the bycatch-monitoring system described in Amendment 16 is sufficient to reasonably comply with § (a)(15).

> c.   Compliance with § (a)(11)

Finally, Oceana alleges that Amendment 16 also independently violates § (a)(11), which requires that FMPs "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery."  <u>See</u> Plf. Reply at 6.  As Amendment 16 does not purport to establish a bycatch-reporting methodology that complies with § (a)(11), and therefore does nothing to alter the bycatch-reporting methodology adopted through the SBRM Amendment, Oceana's final bycatch-monitoring claim is essentially a challenge to that Amendment.   As discussed in Section III(A)(1)(a), *supra*, Oceana argues that the SBRM Amendment's bycatch-reporting methodology "was not designed for use in a system with enforceable catch limits and accountability measures, such as those established by Amendment 16," and is thus inadequate to monitor bycatch under the Multispecies Fishery's new output-based management system.  <u>See</u> Plf. Mot. at 17, 20.  This issue, however, is not properly before the Court.

The question of whether the Multispecies FMP (including all of its amendments) has established an adequate standardized bycatch-reporting methodology that complies with § (a)(11) is the very question being litigated in a separate case involving the SBRM Amendment. <u>See</u> <u>Oceana, Inc. v. Locke</u>, 725 F. Supp. 2d 46 (D.D.C. 2010), <u>rev'd</u> No. 10-5299, 2011 WL 2802989 (D.C. Cir. July 19, 2011).  In that case, the D.C. Circuit ordered that the SBRM Amendment and its implementing rule be vacated, and that the matter be remanded to the Agency for further action.  <u>Oceana, Inc. v. Locke</u>, 2011 WL 2802989, at *1, 5.  Though the grounds for the D.C. Circuit's remand were narrow, NMFS is, as a result of that remand, in the

process of considering a new standardized bycatch-reporting methodology for the Fishery.  See id. at *1-2.  No matter the grounds for Oceana's present challenge to the Multispecies FMP's standardized bycatch-reporting methodology, this Court can provide no further relief because the SBRM Amendment has already been remanded.

To the extent Oceana subsequently believes the standardized bycatch-reporting methodology that eventually results from that remand is inadequate, it will have the opportunity challenge it at a future date.  Judgment on the issue of Amendment 16's bycatch-monitoring provisions will thus be entered in favor of Defendants.

2.   *Accountability Measures for Five Species*

Oceana next argues that Amendment 16 violates § (a)(15) because it fails to establish adequate accountability measures for five species found in the Multispecies Fishery: Atlantic halibut, ocean pout, windowpane flounder, SNE/MA winter flounder, and Atlantic wolffish. Oceana is correct.

As explained above, the MSA requires that FMPs include "measures to ensure accountability" with ACLs "for all stocks and stock complexes in the fishery."  16 U.S.C. § 1853(a)(15); 50 C.F.R. § 600.310(h).  NMFS generally defines accountability measures (AMs) as "management controls to prevent ACLs, including [sub]-ACLs, from being exceeded, and to correct or mitigate overages of the ACL if they occur."  50 C.F.R. § 600.310(g)(1).  In accordance with this interpretation, NMFS recognizes two general categories of AMs: "Inseason AMs" (to "prevent catch from exceeding ACLs" and address predicted inseason ACL overages) and AMs "for when the ACL is exceeded" (based on annual data evaluated at the end of a fishing year).  Id. §§ 600.310(g)(1)-(3).  For the Multispecies Fishery, "fishing year" means May 1 through April 30 of the following year.  See 50 C.F.R. § 648.2.  When an ACL is exceeded,

typical AMs include closing all or part of the Fishery and imposing stricter input or output controls in the subsequent fishing season.  See id. §§ 600.310(g)(2)-(3).

Neither party disputes that Amendment 16 established ACLs and sub-ACLs for the species – referred to interchangeably in this Section as "stocks" – in the Multispecies Fishery. Framework 44, in accordance with the mechanism established by Amendment 16, set total ACLs for Fishing Years 2010-2012 for each stock.  75 Fed. Reg. at 18,360-61 (AR 1001 at 56720-21). It also allocated sub-ACLs – i.e., portions of each stock's total ACL – to the common pool and sectors.  See id.  Significantly, the Council and NMFS opted to allocate all of the Fishery's allotment of the annual catch for the five species to common-pool vessels and none to sector vessels.

When NEFMC establishes sub-ACLs for a fishery's different user groups, as it did here, NMFS's Guidelines indicate FMPs should also establish sub-AMs to ensure accountability with those sub-ACLs.  See 50 C.F.R. § 600.310(h)(1)(iv).  For most stocks, Amendment 16 established such sub-AMs.  Indeed, for the five species at issue, the Amendment also set sub-AMs for common-pool vessels.  For example, for those vessels, if the sub-ACLs for the five species are exceeded in Fishing Years 2010 and 2011, "[days-at-sea] reductions and/or more strict differential [days-at-sea] counting would be put into place in the year following an ACL overage."  Am. 16, § 1.0 (AR 773 at 47764).  Oceana does not claim these AMs are inadequate or fail to comply with § 1853(a)(15).  See Plf. Reply at 7-8.

The difficulty, however, arises with sub-AMs for the five species for sector vessels.  For these vessels, Amendment 16 creates a parallel set of sub-AMs for most other stocks, establishing a sector's annual catch entitlement (ACE) for each species – also referred to as total allowable catch (TAC) – as a hard cap.  See Am. 16, §§ 4.2.3.3.1 (AR 773 at 47857-58); 4.2.3.4

(47861-62).  The Amendment provides: "Sectors are required to ensure that ACEs are not exceeded during the fishing year. . . .  If the sector's ACE for a stock is exceeded, the sector must cease operations in that stock area until it can acquire additional ACE through a transfer to balance the catch, and the sector also must comply with other overage penalties that may be applicable."  Am. 16, § 4.2.3.4 (AR 773 at 47861).

The five species identified by Oceana, however, are explicitly excluded from the sectors' sub-AM regime described above.  See Am. 16, § 4.2.3.3.1 (AR 773 at 47857) ("Sectors will be allocated a hard TAC of all regulated groundfish stocks with the exception of halibut, ocean pout, windowpane flounder, Atlantic wolffish, and SNE/MA winter flounder.").  Sectors do not receive an annual catch entitlement of the five species – i.e., the sector sub-ACL is zero, see 75 Fed. Reg. at 18,360-61 – and therefore sector vessels are prohibited from retaining any fish from these stocks.  For this reason, NMFS indicates, the five species are not subject to an enforceable fishing quota.  See Record of Decision at 39 (AR 889 at 52118).

Oceana claims that Amendment 16's failure to establish sector sub-AMs for these five species violates § 1853(a)(15) of the MSA.  Oceana's argument once against relates to the phenomenon of bycatch.  See Plf. Mot. at 23.  The fact that the five species may not be retained, and are thus unlikely to be targeted by fishermen, does not mean that they will not accidentally be caught and subsequently discarded.  Since the "catch" limited by ACLs includes both fish that are retained (landed) and bycatch that are discarded at sea, see 50 C.F.R. § 600.310(f)(2)(i), the ACLs for the five stocks may be exceeded by accumulation of bycatch alone.  In the event that this occurs, Oceana argues, Amendment 16 has established no measures to ensure accountability with these five species' ACLs and thus fails to comply with § (a)(15).

NMFS responds that Oceana's "argument is based on an over-reading of the legal requirements for accountability measures" and argues that the accountability and management measures established by Amendment 16 comply with § 1853(a)(15)'s requirements.  Def. Mot. at 22-23.  Specifically, NMFS advances three arguments in support of its position that Amendment 16 establishes sufficient accountability measures for the five stocks at issue:

> a) Amendment 16 includes an "overall suite of accountability measures [] sufficient to prevent overfishing of the stock[s] as a whole"; thus sub-AMs for sector vessels are not legally required;

> b) "[M]anagement measures . . . [that] function as prospective accountability measures" and "management measures for the groundfish fishery as a whole will reduce fishing effort on the five stocks in the sector subcomponent and throughout the fishery"; and

> c) NMFS intends to "establish additional accountability measures to further address sectors' catch of the five stocks" in Fall 2011 in the anticipated Framework 47.

Def. Mot. at 23.  The Court will review each in determining whether Amendment 16 contains the accountability measures required by the MSA.

### a.   Overall Accountability Measures for the Five Species

NMFS first argues that Amendment 16 complies with § 1853(a)(15) because sector sub-AMs are not legally required where an FMP establishes an "overall suite of accountability measures [] sufficient to prevent overfishing of the stock[s] as a whole."  Def. Mot. at 23.  The Agency argues that Amendment 16 establishes such AMs that operate to ensure accountability with the Fishery's total ACLs for the five species.  This argument raises interpretive questions about what is meant by § (a)(15)'s accountability-measures requirement.

The MSA does not elaborate on what constitutes "measures to ensure accountability" with ACLs under § (a)(15).  The most helpful evidence before the Court regarding the meaning of § (a)(15)'s AM requirement is found in NMFS's National Standards Guidelines.  See 50

C.F.R. § 600.310(g).  Before the Court can look to the Guidelines for assistance in resolving this

interpretive dispute, however, it must determine how much deference they are owed.

It is well established that courts must defer to an agency's reasonable interpretation of

ambiguous provisions in a statute it administers generally, and to its decision to approve an FMP

or FMP amendment in particular, in accordance with the analytical framework established by the

Supreme Court in Chevron, 467 U.S. 837.  See Natural Resources Def. Council, Inc. v. Daley,

209 F.3d 747, 752-53 (D.C. Cir. 2000).  But the question of what deference is owed to NMFS's

Guidelines is more complex.  NMFS's National Standards Guidelines do not carry the force of

law, see 16 U.S.C. § 1851(b), and are thus not automatically entitled to Chevron deference.  See

United States v. Mead Corp., 533 U.S. 218, 226-27 (2001).  They are, however, entitled to a

level of deference warranted by the facts and circumstances surrounding their creation.  See

Skidmore v. Swift & Co., 323 U.S. 134 (1944).  In determining the appropriate level of

deference owed to agency regulations that do not carry the force of law, courts generally look to

"the degree of the agency's care, its consistency, formality, and relative expertness, and to the

persuasiveness of the agency's position."  Mead Corp., 533 U.S. at 228 (citing Skidmore, 323

U.S. at 139-40).

In light of the factors identified in Mead and Skidmore, the Guidelines here deserve

considerable deference.  NMFS adopted the Guidelines following a procedure that evidenced a

high degree of care and formality.  For instance, prior to adopting 50 C.F.R. § 600.310, NMFS

published the proposed rule in the Federal Register and sought public comments on two separate

occasions.  See 63 Fed. Reg. 24212 (May 1, 1998); Tutein v. Daley, 43 F. Supp. 2d 113, 119

n.10 (D. Mass. 1999).  The Guidelines are detailed, reflect NMFS's considerable expertise in the

complex field of fishery management, and are routinely cited by courts as persuasive authority

on the meaning of the MSA.  See, e.g., Oceana, Inc. v. Evans, 2005 WL 555416, at *10-14;

Natural Resources Def. Council, 209 F.3d at 753.  Perhaps recognizing that they warrant a

relatively high level of deference, Oceana does not challenge the Guidelines and in fact cites

them in support of its argument. See, e.g., Plf. Mot. at 21-22.  The Court thus turns to the section

of the Guidelines addressing AMs.

        The Guidelines support NMFS's legal position that sub-AMs are not mandatory so long

as Amendment 16 establishes an overall suite of accountability measures sufficient to prevent

overfishing of each of the five stocks as a whole.  The Guidelines indicate that in total, "[t]he

system of ACLs and AMs designed must be effective in protecting the stock or stock complex as

a whole."  50 C.F.R. § 600.310(f)(5)(ii).  The Guidelines clearly favor the establishment of sub-

AMs whenever a fishery is governed by sub-ACLs: when a fishery is fished by vessels that

constitute "distinct user group[s] to which separate management strategies and separate catch

quotas apply," such as sector vessels and the common pool, it may be necessary to divide the

ACL for a stock into sub-ACLs "so that appropriate AMs can be developed for each sector."  50

C.F.R. § 600.310(f)(5)(ii).  A close reading of the Guidelines, however, reveals that while sub-

AMs are recommended, they are not mandatory: "In establishing ACL mechanisms and AMs,

FMPs should describe: . . . [sub]-AMs, if there are [sub]-ACLs."  Id. § 600.310(h)(1)(iv)

(emphasis added).  See id. § 600.305(c)(3) ("Should is used to indicate that an action or

consideration is strongly recommended to fulfill the Secretary's interpretation of the Magnuson-

Stevens Act, and is a factor reviewers will look for in evaluating [an] . . . FMP.").

        The Court must thus consider whether, Fishery-wide, the AMs established for these five

stocks sufficiently "ensure accountability" with their respective total ACLs.  In support of its

argument that Amendment 16 contains AMs sufficient to protect each of the five stocks as a

whole, NMFS points to Amendment 16's implementing regulation to argue that the AMs in place for the common pool will be triggered when the total ACL for the stock has been exceeded – either by common-pool vessels or sector vessels.  Def. Mot. at 26 (citing 75 Fed. Reg. at 18,270 (AR 997 at 56494); 50 C.F.R. § 648.90(a)(5)(ii); (a)(5)(i)).  The regulation states:

> [If] components of the fishery that are not subject to AMs at this time . . . exceed their allocations, and the overall ACL for a particular stock is exceeded, the AMs applicable to the NE multispecies fishery described above, including those specified for sector, common pool, and recreational and charter/party vessels, could be triggered to ensure that overfishing does not occur on the stock as a whole.

Id.  Under this system, common-pool vessels' days-at-sea allotment (for FY 2010-2011) would be adjusted to compensate for the ACL overage incurred in the prior fishing year.[3]

The evidence presented by both parties, however, suggests that adjusting fishing-input or -output controls for the common pool alone will be insufficient to protect these five stocks from overfishing.  See Def. Mot. at 26; Plf. Reply at 8-9.  Fishing by common-pool vessels now accounts for only 2% of the fishing taking place in the Multispecies Fishery.  See 75 Fed. Reg. at 18,114 (AR 996 at 56466); AR 961 at 56170; AR 967 at 56258.  NMFS, in fact, acknowledges that this may negatively affect the ability of these AMs, which restrict the fishing activities of only common-pool vessels, to enforce the five stocks' total ACLs.  See Def. Mot. at 26.  In other words, the best evidence the Agency has pointed to concerning total AMs for the five stocks caught as bycatch by vessels fishing 98% of the Fishery are reductions in fishing effort imposed upon vessels fishing 2% of the Fishery.  The Agency itself concedes this may be inadequate

---

[3] Oceana contends that Amendment 16's implementing regulations do not provide for the common-pool reactive AMs to be triggered when sector vessels overfish the five stocks.  Plaintiff points out that NMFS has proposed a new rule would allegedly take this step.  See Plf. Reply at 9 (citing 76 Fed. Reg. 24,446, 24,452).  NMFS responds that the "proposed rule merely clarified that the common pool accountability measures cover sector overages of the five stocks."  Def. Reply at 5 n.4.  Because even under NMFS's interpretation, the common-pool accountability measures are unlikely to protect the stocks from overfishing, the Court need not resolve this dispute.

compensation.  Id. ("[I]f sector vessels catch too many fish for any of the five stocks, in addition

to the prospective accountability measures discussed below, fishing effort in the common pool is

adjusted to address the overage, to the extent possible, given the relatively small allocation to the

common pool.")  (emphasis added).

Even if the common-pool AMs in place for FYs 2010 and 2011 – namely, days-at-sea

reductions – were sufficient to protect the five stocks from overfishing, this may no longer be the

case come FY 2012, when the common pool, like the sectors, will begin to be governed by

output-based management controls.  Three of the five species (ocean pout, windowpane

flounder, and Atlantic halibut) will not be subject to the common pool's enforceable quota

(TAC) that becomes operative in FY 2012, and will thus be exempt from stock area closures.

Am. 16, § 4.3.7.1.2 (AR 773 at 47912); Record of Decision at 39 (AR 889 at 52118).

Based on this evidence, the Court cannot conclude that the overall AMs in place to

enforce the total ACLs for the five species are sufficient to obviate the need for sector sub-AMs

for these stocks.

### b.  Prospective Accountability Measures

Defeated on that point, NMFS's alternative position is that Amendment 16 complies with

the MSA's accountability-measures requirement by establishing sector-specific "management

measures" that function as prospective sub-AMs for the five species.  Def. Mot. at 23.

Prospective accountability measures, NMFS contends, are a valid type of in-season AM designed

to prevent an ACL overage before it occurs.  See id. at 29.  Oceana responds that prospective

"management measures cannot take the place of accountability measures" and, on their own,

cannot satisfy the MSA.  Plf. Reply at 10.

As noted above, the Guidelines recognize both "inseason" AMs and post-season AMs

"for when the ACL is exceeded."  50 C.F.R. § 600.310(g)(1).  To determine whether the MSA

can be satisfied by "management measures" that function as "prospective" AMs, which NMFS

contends Amendment 16 establishes, Def. Mot. at 28-29, the Court looks to the Guidelines

section describing inseason AMs. This section states:

> Whenever possible, FMPs should include inseason monitoring and
> management measures to prevent catch from exceeding ACLs.
> Inseason AMs could include, but are not limited to: [annual catch
> targets]; closure of a fishery; closure of specific areas; changes in
> gear; changes in trip size or bag limits; reductions in effort; or other
> appropriate management controls for the fishery.

50 C.F.R. § 600.310(g)(2) (emphasis added).  The Guidelines thus explicitly include

"management measures" in their description of appropriate AMs and endorse the inclusion of

prospective measures.  This is consistent with the Guidelines' general definition of

accountability measures as including "management controls to prevent ACLs, including [sub]-

ACLs, from being exceeded . . . ."  Id. § 600.310(g)(1).  Section 600.310(g), moreover, is

consistent with the statutory language of the MSA, which states only that FMPs must "establish .

. . measures to ensure accountability" with ACLs set "at a level such that overfishing does not

occur in the fishery."  16 U.S.C. § 1853(a)(15).  The Court is persuaded that NMFS has acted

rationally and reasonably in interpreting the MSA to permit preventive or prospective AMs of

the type described in § 600.310(g)(2).

   While prospective AMs may generally be appropriate, the Court must now look at the

five stocks at issue.  A review of Amendment 16 reveals that NMFS has indeed included

prospective management measures for sectors for these five stocks.  For example, Amendment

16 implements "reductions in effort" – or strict limits on retention of fish from these five stocks

– due to their depleted status.  Sector vessels are prohibited from landing any SNE/MA winter

flounder, windowpane flounder, ocean pout, or Atlantic wolffish, see Am. 16, §§ 4.2.3.4, 4.3.5

(AR 773 at 47862, 47895).  Sectors are accordingly not allocated annual catch entitlements of

these species (or of Atlantic halibut), see id., § 4.2.3.3.1 (AR 773 at 47858),  and Framework 44,

which contains the ACLs for FYs 2010-2012, thus identifies the sub-ACLs for sectors, for each

of these species, as zero.  See 75 Fed. Reg. at 18,360-61 (AR 1001 at 56720-21).

NMFS argues – rationally, in the Court's view – that these strict retention limits "will

discourage sectors from targeting these [five] stocks," Am. 16, § 4.2.3.4 (AR 773 at 47862),

which, in turn, will likely reduce their catch levels.  While these effort-reduction controls may

more appropriately be described as "pre-season" rather than "inseason" measures, their aim is no

doubt preventive, and they reflect one type of control envisioned by § 600.310(g)(2).  The Court

thus finds that Amendment 16 does include some appropriate prospective accountability

measures designed to prevent overfishing of the five stocks at issue.  The Court is convinced,

however, that they are not enough.

NMFS's Guidelines indicate that while inseason AMs like the ones established by

Amendment 16 for the five stocks are appropriate and even recommended, AMs for when an

ACL is exceeded are mandatory: "[T]he Council must determine as soon as possible after the

fishing year if an ACL was exceeded.  If an ACL was exceeded, AMs must be triggered and

implemented as soon as possible . . . ."  50 C.F.R. § 600.310(g)(3) (emphasis added); see also

Am. 16, § 4.3.7 (AR 773 at 47904) ("AMs must apply if the ACL is exceeded.") (emphasis

added) (citing 74 Fed. Reg. 3178, 3184 (Jan. 16, 2009).  The reason why is apparent from the

facts before the Court.  The fact that sector vessels are prohibited from landing fish from the five

stocks does not mean they will successfully avoid catching these species.  While NMFS's

decision not to allocate a catch entitlement for these stocks to sectors in FYs 2010-2012 should

decrease the likelihood that these species will be caught intentionally, NMFS cannot as a

practical matter prevent sector vessels from accidentally catching these species as bycatch in the

course of their efforts to catch other species of groundfish.  When this happens, unlike with common-pool vessels, no sub-AMs will prevent sector vessels from continuing to fish in the areas containing the five stocks no matter how much bycatch they acquire in excess of their sub-ACLs (of zero).  As Oceana argues, in the absence of sub-AMs, sector vessels can catch the five species as bycatch "with impunity" and, in doing so, cause their continued overfishing.  Plf. Mot. at 21.

The Court reaches its conclusion that Amendment 16 lacks adequate AMs for when the sector sub-ACLs have been exceeded in spite of the deference it accords the Agency.  Devising and structuring a system of accountability measures to ensure compliance with annual catch limits no doubt involves highly technical considerations of scientific information. See Oceana, Inc. v. Locke, 725 F. Supp. 2d at 53.  It is thus "'especially appropriate for the Court to defer to the expertise and experience of those individuals and entities – the Secretary, the Councils, and their advisors – whom the [MSA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.'"  Id. (quoting Nat'l Fisheries Inst., Inc. v. Mosbacher, 732 F.Supp. 210, 223 (D.D.C.1990)); see also Pittston Coal Group v. Sebben, 488 U.S. 105, 150 (1988) ("[A]s an interpretive question becomes more technical, the expertise of the agency charged with a statute's administration becomes greater and deferring to its construction rather than importing our own becomes more appropriate.")

Even so, to survive a challenge under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action."  Motor Vehicle Manufacturers Ass'n, 463 U.S. at 43; see also AT&T Corp. v. F.C.C., 236 F.3d 729, 734 (D.C. Cir. 2001) (same).  The Agency is obligated to "'cogently explain' why" its decisions satisfy statutory obligations,

Natural Resources Def. Council, 209 F.3d at 755 (internal citation omitted), and must be able to

"articulate[] a rational connection between the facts found and the choice made."  Baltimore Gas

and Elec. Co., 462 U.S. at 105.

The facts before the Agency do not support the choice NMFS made to approve

Amendment 16 in the absence of sufficient AMs for the five stocks.  In fact, NMFS's Regional

Administrator, Patricia Kurkul, expressed reservations over Amendment 16's compliance with §

1853(a)(15)'s AM requirements:

> NMFS remains concerned with other issues related to measures, or
> lack thereof, in Amendment 16.  Although Amendment 16 includes
> a process to specify annual catch limits for all stocks, not all stocks
> are covered by specific accountability measures (AMs).  Several
> stocks (Southern New England/Mid-Atlantic winter flounder, ocean
> pout, windowpane flounder, and wolffish) are not specifically
> allocated to sectors and would not be covered by specific sector
> AMs under Amendment 16.  In additional, ocean pout, windowpane
> flounder, and Atlantic halibut would not be subject to the common
> pool hard total allowable catch AM beginning in 2012.  Because the
> Secretary is restricted by the Magnuson-Stevens Act to only
> approve, disapprove, or partially approve an amendment to an FMP,
> NMFS cannot insert specific AMs for these stocks into Amendment
> 16 and cannot disapprove based on the lack of specific AMs.  While
> NMFS anticipates that other measures in Amendment 16 should be
> sufficient to prevent overfishing on these stocks, to ensure
> compliance with the Manguson-Stevens Act, the Council should
> develop appropriate AMs for these stocks as quickly as possible
> through a future action.

Letter from P. Kurkul, Regional Administrator, to J. Pappalardo, Chair, NEFMC (Jan. 21, 2010)

(AR 891 at 52244) (emphasis added).  These reservations suggest even NMFS is concerned by

the lack of sufficient sector sub-AMs for the five stocks.

Defendants, moreover, have articulated no satisfactory explanation for their failure to

include "reactive" AMs for the five stocks in Amendment 16.  The rationale NMFS offers for

declining to enforce hard TACs for sector vessels that catch the five species as bycatch is that

this action "would complicate monitoring of sector operations," Am. 16, § 4.2.3.3.1 (AR 773 at

47858), and "would likely result in unnecessarily closing large areas [of the Fishery] and substantial adverse economic impacts to vessels and associated fishing communities due to excessive catch of these stocks."  Record of Decision at 39 (AR 889 at 52118). Statutory requirements that render fishery management more difficult or expensive, however, may not simply be disregarded.  See Natural Resources Def. Council, 209 F.3d at 753 ("It is only when two different plans achieve similar conservation measures that the Service takes into consideration adverse economic consequences.").  Furthermore, NMFS's final argument suggests these difficulties are not insurmountable.  The Agency notes:

> It would be non-sensible and be contrary to the requirement of the Magnuson-Stevens Act to immediately end overfishing and rebuild overfished stocks for the Secretary to disapprove the entire amendment or send the amendment back to the Council to address possible shortcomings for a few stocks. . . .  Instead, NMFS intends to inform the Council of the need to revisit the lack of specific AMs for these few stocks.

Record of Decision at 39 (AR 889 at 52118).

The Court, accordingly, finds that the accountability measures Amendment 16 establishes for the five species at issue will not ensure accountability with ACLs as § 1853(a)(15) requires. This brings the Court to NMFS's final argument: the Court should not find Amendment 16 unlawful because the Agency intends to establish AMs for the five species in a future rulemaking.

### c.   Future Accountability Measures

This last contention is easily dispensed with.  Because Amendment 16 is otherwise noncompliant with § 1853(a)(15), NMFS's suggestion that it intends to expand AMs for these five species in a future framework-adjustment rulemaking will not satisfy the MSA.  A future plan to comply with the MSA will not save an otherwise deficient FMP.  See, e.g., Conservation Law Foundation, 209 F. Supp. 2d at 9-10 (rejecting Defendants' claim that "by August 2003,

40

they will seek to implement a forthcoming Amendment 13, which will purportedly comply with the [Act]" where framework adjustment then in place was insufficient).

The Court must therefore conclude that the adoption of Amendment 16 without the accountability measures required by the MSA for five stocks was arbitrary, capricious, and unlawful.  The Court will remand the issue to NMFS and NEFMC for the purpose of amending the Multispecies FMP so that it is consistent with the requirements of § 1853(a)(15).

        3.    *Accountability Measures for Yellowtail Flounder in Scallop Fishery*

Oceana's third and final claim under the Magnuson-Stevens Act asserts that Amendment 16 fails to establish adequate accountability measures for another overfished species – yellowtail flounder.  Recent developments, however, have addressed its concern and rendered this issue moot.

Three stocks of yellowtail flounder – the Georges Bank ("GB") stock, the Southern New England/Mid-Atlantic ("SNE/MA") stock, and the Cape Cod/Gulf of Maine ("CC/GOM") stock – live in the region governed by NEFMC.  See Am. 16, § 1.0 (AR 773 at 47763).  Yellowtail flounder are targeted by fishing vessels in the Multispecies Fishery and are thus primarily managed by the Multispecies FMP.  See 50 C.F.R. § 600.310(d)(7) ("If a stock is identified in more than one fishery, Councils should choose which FMP will be the primary FMP in which . . . the stock's overall ACL . . . [is] established.")  Significant numbers of these fish, however, are also caught as bycatch by vessels fishing in the Scallop Fishery.  See Framework 44, 75 Fed. Reg. at 18,358-60 (AR 1001 at 56718-20).  The Scallop Fishery, also governed by NEFMC, is managed by the separate Atlantic Sea Scallop FMP.

Because yellowtail flounder are subject to overfishing, see Am. 16, § 1.0 (AR 773 at 47763), the MSA required the establishment of ACLs and AMs for these three stocks by FY 2010.  MSA, Pub. L. No. 109-479, § 104(b), 120 Stat. 3575, 3584 (2007).  Amendment 16 and

Framework 44 establish such ACLs.  See Framework 44, 75 Fed. Reg. at 18,360-61 (AR 1001 at

56720-21) (Tables 3-5).  In fact, to account for the amount of GB and SNE/MA yellowtail

flounder inadvertently caught in the Scallop Fishery, Framework 44 allocates portions of the

ACLs for these stocks to that Fishery.  Id., 75 Fed. Reg. at 18,359 (AR 1001 at 56719) (Table 2).

It is with AMs, however, that the problem lies.  While Framework 44 establishes AMs for

the portion of yellowtail flounder allocated to the Multispecies Fishery, it does not do so for the

Scallop Fishery: "Under the current Atlantic Sea Scallop FMP, if the scallop fishery harvests in

excess of the yellowtail flounder sub-components specified for the fishery for FY 2010, no

scallop management measures will be triggered.  The Council intends to develop AMs for the

Atlantic Sea Scallop FMP that would be responsive to yellowtail flounder catches in excess of

the sub-ACL, beginning in FY 2011."  Id. (emphasis added).

Oceana claims that Amendment 16 violates § 1853(a)(15) by "postponing the

implementation of accountability measures for yellowtail flounder caught in the scallop fishery

until such measures are developed in connection with amendments to the separate Atlantic Sea

Scallop Fishery Management Plan."  Plf. Mot. at 3.  Defendants advance two arguments in

response.  First, they contend that Amendment 16 in fact establishes the requisite accountability

measures for yellowtail flounder.  Def. Mot. at 34-36.  Second, they urge the Court to find

Plaintiff's claim rendered prudentially moot by Amendment 15 to the Atlantic Sea Scallop FMP,

which, at the time of briefing, was awaiting NMFS's approval.  Id. at 39.  The Court, having a

duty to determine as a preliminary matter whether an actual case or controversy exists between

the parties, properly considers Defendants' second argument first.

Article III of the United States Constitution limits the jurisdiction of the federal courts to

resolving "Cases" and "Controversies."  U.S. CONST. art. III, § 2, cl. 1.  Federal courts therefore

lack "the power 'to decide questions that cannot affect the rights of litigants in the case before

them,' . . . and [are confined] to resolving '"real and substantial controver[ies] admitting of

specific relief through a decree of a conclusive character, as distinguished from an opinion

advising what the law would be upon a hypothetical state of facts.'"'" Lewis v. Continental Bank

Corp., 494 U.S. 472, 477 (1990) (internal citations omitted).  When a claim becomes moot,

federal courts cease to have jurisdiction over it.  See id. at 477-78; Columbian Rope Co. v. West,

142 F.3d 1313, 1316 (D.C. Cir. 1998) (federal court must dismiss case as moot when "'events

have so transpired that the decision will neither presently affect the parties' rights nor have a

more-than-speculative chance of affecting them in the future'") (citation omitted).  The case-or-

controversy requirement subsists throughout the life of the case: "To sustain our jurisdiction in

the present case, it is not enough that a dispute was very much alive when suit was filed[.]"

Lewis, 494 U.S. at 477.  "If events outrun the controversy such that the court can grant no

meaningful relief, the case must be dismissed as moot."  McBryde v. Committee to Review

Circuit Council Conduct and Disability Orders of Judicial Conference of U.S., 264 F.3d 52, 55

(D.C. Cir. 2001).

　　　Throughout its briefing, Oceana correctly argued that "the potential development of

accountability measures as part of Amendment 15 to the Atlantic Sea Scallop Fishery

Management Plan does not render their omission from Groundfish Amendment 16 lawful."  Plf.

Reply at 13.  As noted above, the Agency's intent or plan to take future remedial action would

not save an FMP that was otherwise defective.  See Section III(A)(2)(c), *supra*.

　　　In the meantime, however, NMFS approved Amendment 15 to the Scallop FMP and, on

July 21, 2011, adopted a final rule implementing that Amendment.  See Scallop FMP

Amendment 15, available at http://www.nefmc.org/scallops/index.html; 76 Fed. Reg. 43,746

(July 21, 2011) (codified at 50 C.F.R. pt. 648).  Amendment 15 institutes accountability

measures in the Scallop Fishery for overages of the sub-ACLs for yellowtail flounder allocated

to that Fishery beginning in FY 2011.  See Scallop Am. 15, § 3.2.3.11.2.1.1; see also 75 Fed.

Reg. at 43,770-72.  Amendment 15 also includes a "reachback" AM for FY 2010 to compensate

retroactively for any yellowtail flounder caught in the Scallop Fishery in excess of that Fishery's

allocation prior to the development of the Scallop Fishery sub-AM.  See Scallop Am. 15, §

3.2.3.11.2.1.5.  These AMs are codified in Scallop Amendment 15's implementing regulations.

See 50 C.F.R. §§ 648.64(b)(1) ("If the Georges Bank yellowtail flounder sub-ACL for the

scallop fishery is exceeded, the area defined by the following coordinates shall be closed to

scallop fishing by vessels issued a limited access scallop permit . . . ."); (c)(1) ("If the Southern

New England/Mid-Atlantic yellowtail flounder sub-ACL for the scallop fishery is exceeded, the

area defined by the following coordinates shall be closed to scallop fishing . . . ."); (f) ("AMs

shall be applied in the 2011 fishing year for any overage of the applicable yellowtail flounder

stock's total ACL in the 2010 fishing year in accordance with the APA.").

     In cases involving challenges to previous FMP amendments in which NMFS

subsequently took the requested action through a new amendment or framework adjustment

while the case was pending, courts have routinely found that the claim has become moot.  See,

e.g., Oceana, Inc. v. Evans, 2005 WL 555416, at *3 (collecting cases); Oceana, Inc. v. Evans,

No. 03-10570, 2004 WL 1730340, at *3-5 (D. Mass. July 30, 2004) (dismissing lawsuit as moot

where framework at issue had been superseded by Amendment 10); Associated Fisheries of Me.,

Inc. v. Evans, 350 F. Supp. 2d 247, 249, 256-57 (D. Me. 2004) (dismissing as moot challenge to

Secretary's procedures in adopting Amendment 13 in light of superseding interim rule that

corrected purported flaws).  As Judge Huvelle explained in Oceana, Inc. v Evans, "Where a

regulation has been superseded, a challenge to the earlier rule is moot." 2005 WL 555416, at

*23 (citing Gulf of Maine Fisherman's Alliance v. Daley, 292 F.3d 84, 88 (1st Cir. 2002)

(holding that promulgation of new framework governing a fishery is intervening event that

moots challenges to "either procedural failures or substantive deficiencies associated with a

[defunct] regulation")).  The Court finds this authority persuasive in the present case.

Neither party sought to file supplemental briefing with the Court following the adoption

of Amendment 15 to the Scallop FMP, and Oceana has offered no explanation for how its claim

could survive the adoption of Amendment 15.   If Oceana believes the AMs established by

Amendment 15 are inadequate to protect yellowtail flounder in the Scallop Fishery from

overfishing, it is free to challenge that Amendment in a separate action.  For the purpose of this

lawsuit, however, the Court finds that the adoption of Amendment 15 moots Plaintiff's claim

regarding the lack of AMs for yellowtail flounder in the Scallop Fishery, as there is no ongoing

controversy and the Court can grant Oceana no further relief.  It will thus be dismissed.

B.    NEPA

Oceana's remaining claims arise under NEPA.  As explained above, NEPA imposes

procedural rather than substantive duties on government agencies undertaking major federal

action, such as the adoption of an FMP or FMP amendment.  See Citizens Against Burlington,

Inc. v. Busey, 938 F.2d 190, 193-94 (D.C. Cir. 1991) ("Congress chose to make NEPA

procedural. . . .  NEPA does not mandate particular consequences.").  Under NEPA, an agency is

required to evaluate and make public the environmental consequences of its proposed action.

When those consequences are expected to be significant, NEPA requires the preparation of an

environmental impact statement (EIS) that, *inter alia*, "[r]igorously explore[s] and objectively

evaluate[s] all reasonable alternatives" to the agency's proposed action, as well as the alternative

of "no action." 40 C.F.R. § 1502.14.

While the stringent nature of these requirements is not to be minimized, "an agency need follow only a 'rule of reason' in preparing an EIS." Citizens Against Burlington, 938 F.2d at 195. The Court's review of an agency's compliance with NEPA is thus deferential. Id. at 196. Such "[d]eference is particularly warranted in cases such as this involving complex scientific or technical matters where the agency's expertise is clear." The Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 162 (D.D.C. 2005) (citing Izaak Walton League of America v. March, 655 F.2d 346, 372 (D.C. Cir. 1981)).

This is not a case in which Plaintiff contends the Agency altogether failed to undertake a proper environmental assessment of its action. Indeed, the Council prepared and NMFS adopted a Final Environmental Impact Statement (FEIS) that, along with Amendment 16 (the proposed action), spans more than 900 pages. See, generally, AR 773. Rather, Oceana asserts two targeted NEPA claims regarding Amendment 16. It first argues that, by not reevaluating which stocks should properly be considered part of the Multispecies Fishery, NMFS failed to take the required "hard look" at the environmental consequences of its action. See Plf. Mot. at 32-35 (citing March v. Oregon Natural Resources Council, 490 U.S. 360, 374 (1989)). Second, Oceana contends that the FEIS did not properly consider all reasonable alternatives to a different aspect of the Amendment: the ABC Control Rule. See Plf. Mot. at 35.

In light of the Court's limited and deferential role, the Agency's considerable expertise in this complex regulatory arena, and the thoroughness of Amendment 16 and its accompanying FEIS, the Court finds both of Plaintiff's NEPA challenges unavailing.

### 1.    *Hard Look at Species in the Fishery*

Plaintiff's first NEPA challenge stems from NMFS's duty to take a "'hard look' at [the] environmental consequences" of its actions. Natural Resources Defense Council v. Morton, 458 F.2d 827, 838 (D.C. Cir. 1972). Specifically, Oceana argues that NMFS failed to "take a 'hard

look' at the conditions of the fish stocks affected by the fishery and the environmental impacts of

excluding stocks from the status of a stock 'in the fishery' and subject to ACLs."  Plf. Mot. at 32.

Oceana asserts that "[t]o comply with NEPA's hard-look directive, the [FEIS] underlying

Amendment 16 should at the very least have considered what species are caught in the Northeast

Multispecies Fishery, whether those species should be deemed stocks 'in the fishery' and subject

to an ACL, and why."  Id. at 33.  Plaintiff demands more than NEPA requires.

At bottom, Oceana's challenge is not to any NMFS action, but rather to its inaction – the

decision not to consider whether additional species should be included among the stocks in the

Fishery.  Plaintiff contends that failure to include a particular species as a stock in the Fishery

has an environmental impact on that species, as it will be not be protected by an ACL or AMs,

and that Defendants improperly failed to discuss these impacts in the FEIS.  See id. at 32-35; 50

C.F.R. § 600.310(h) (MSA only requires FMP to establish ACLs and AMs for stocks "in the

fishery").  Rather than asserting that NMFS failed to take a hard look at the environmental

consequences of its actions, therefore, Plaintiff's claim is more properly viewed as an allegation

that NMFS improperly failed to consider an alternative action to maintaining the status quo

composition of the Fishery.  The Court ultimately concludes that NMFS was not required in

Amendment 16's FEIS to conduct a broad inquiry into whether additional species should be

included in the Fishery.  This is because such consideration lay outside the scope of Amendment

16's objectives, which the Court finds reasonable.

NEFMC developed the goals and objectives of Amendment 16 following a "scoping

process" that included public hearings and a notice-and-comment period.  See Am. 16, § 3.3 (AR

773 at 47818-23).  The final Amendment contains a clear list of the Council's goals and

objectives for this particular amendment to the Multispecies FMP.  Id., § 3.4 (AR 773 at 47823-

24).  None suggests the purpose of Amendment 16 included a wholesale revisiting of the
threshold question of which species should properly be considered stocks in the Multispecies
Fishery.  See id.  As an overview, the Council described Amendment 16 as implementing "a
broad range of measures designed to achieve mortality targets, provide opportunities to target
healthy stocks, mitigate (to the extent possible) the economic impacts of the measures, and
improve administration of the fishery."  Id., § 1.0 (AR 773 at 47762) (emphasis added).  These
goals and objectives do not explicitly address species not already included in the Fishery.

     The Council's treatment of two species – Atlantic wolffish and cusk – further
demonstrates the extent to which adding new stocks to the Fishery fell outside the scope of
Amendment 16.  When NEFMC prepared the original Multispecies Fishery FMP in 1985, it
"evaluated [which] stocks were interrelated such that management as a unit was reasonable and
such that the species could be managed throughout their range" and made a determination
regarding which stocks should be included in the Fishery.  Def. Mot. at 42 (citing 1985
Multispecies FMP, §§ 4.1, 4.3, 6.3).  In doing so, NEFMC observed that it might be necessary in
the future to add these two particular species to the Fishery or to make other changes.  See id.;
see also 1985 Multispecies FMP, § 4.2.  While the Council opted to add Atlantic wolffish to the
Multispecies Fishery through Amendment 16, see §§ 4.2.2, 6.1.7, 6.1.7.1, 7.3.1.2.2 (AR 773 at
47850, 48026-30, 48339), it explicitly acknowledged that a determination of whether to add cusk
was outside the scope of the Amendment.  See Am. 16, Appx. V, V-24-V-25 (AR 773 at 48796-
97).  In response to the comment that "[c]usk should be added to the management plan," the
Council wrote:

          This comment was outside the scope of issues considered by the
          Council.  The Council noted in scoping the possibility that cusk
          would be added to the management plan.  But in order to manage a
          stock, an assessment is needed so that stock status and reference

> points can be determined.  Cusk has not yet been assessed by the
> NEFSC and the information is not available to add it to the
> management unit.

Id.  Given this conclusion on cusk, it is clear the Council did not view an evaluation of whether

to add species other than wolffish to the Fishery as within the scope of Amendment 16.

Oceana nevertheless claims that NFMS should have considered, in preparing Amendment

16's FEIS, whether to add not just cusk but any number of additional species to the Multispecies

Fishery.  As noted above, in reviewing a NEPA claim, courts in this Circuit have long

recognized that an agency "need follow only a 'rule of reason' in preparing [its] EIS." Citizens

Against Burlington, 938 F.2d at 195 (quoting Natural Resources Defense Council, 458 F.2d at

834, 837)).  Because the agency "bears the responsibility for defining at the outset [its]

objectives," Citizens Against Burlington, 938 F.2d at 196, it has broad discretion to set the scope

of its proposed action and, consequently, the scope of its environmental review.  See City of

Alexandria v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) ("NEPA's injunction that agencies

consider the environmental impacts of 'all reasonable alternatives' does not substantively

constrain an agency's choice of objectives.").  Rather, the goals of the Agency's action "delimit

the universe of the action's reasonable alternatives." Citizens Against Burlington, 938 F.2d at

195.  Thus if an alternative "does not 'bring about the ends of the federal action,'" or is not

feasible in light of these goals, the agency need not consider it.  Slater, 198 F.3d at 867 (quoting

Citizens Against Burlington, 938 F.2d at 195).

In determining whether an agency properly excluded an alternative proposed action from

consideration under NEPA, the Court engages in a two-part process: first, an examination of

"whether an agency's objectives are reasonable," and second, "whether a particular alternative is

reasonable in light of these objectives." Slater, 198 F.3d at 867.  Throughout this process, the

Court grants "considerable deference to the agency's expertise and policy-making role." Id.

The Court finds the Council's decision to limit the scope of Amendment 16 to the goals

and objectives described above to be reasonable.  Oceana has pointed to no statutory or

regulatory requirement that the Council conduct a reevaluation of the composition of the Fishery

at the time of proposing Amendment 16.  Furthermore, as acknowledged throughout this

Opinion, fishery management is "exceedingly complex."  Oceana v. Evans, 384 F. Supp. 2d at

242.  This complexity limits, as a practical matter, the universe of possible actions that must be

considered:

> While it is true that agencies have a duty to consider "significant
> and viable alternatives" identified through public comments . . . the
> duty to consider all such alternatives does not extend to situations
> where the possibilities are so numerous and the goals of the action
> so complex that the agency cannot possibly consider every
> significant alternative in a reasonable time period.  Rather, in these
> circumstances, the agency has discretion to choose a manageable
> number of alternatives to present a reasonable spectrum of policy
> choices that meet the goals of the action.

Id. at 241.  This is especially so in the present case, in which the Council and NMFS acted to

approve an amendment to the Multispecies FMP that would comply with the MSA's requirement

that ACLs and AMs be established for all stocks in the Fishery that are subject to overfishing by

FY 2010.  See MSA, Pub. L. No. 109-479, § 104(b), 120 Stat. 3575, 3584 (2007); Citizens

Against Burlington, 938 F.2d at 195 ("[Council on Environmental Quality] regulations oblige

agencies to discuss only alternatives that are feasible, or (much the same thing) reasonable.")

(citing 40 C.F.R. §§ 1502.14(a)-(c), 1508.25(b)(2)).

In light of Amendment 16's goals and objectives, as well as the time limits for action

imposed by the MSA, NEPA did not require that NMFS take a hard look at "the environmental

impacts of excluding stocks from the status of a stock 'in the fishery' and subject to ACLs."  Plf.

Mot. at 32.  Evaluating whether to add additional stocks to the Fishery would not further the

Council's purpose of "achiev[ing] mortality targets, provid[ing] opportunities to target healthy

stocks, mitigat[ing] (to the extent possible) the economic impacts of the measures, and improv[ing] administration of <u>the fishery</u>."  Am. 16, § 1.0 (AR 773 at 47762) (emphasis added). The Council's decision not to consider the alternative of undertaking such an evaluation was thus reasonable in light of Amendment 16's objectives.  The Court thus grants summary judgment for Defendants on this claim.

> 2.   *Failure to Consider Alternatives to ABC Control Rule*

Oceana's final challenge relates to yet another fishery-health measurement established by Amendment 16 – the acceptable biological catch (ABC) – and the "control rule" NMFS will use to set ABC levels for stocks in the Multispecies Fishery.  Specifically, Plaintiff maintains that in preparing Amendment 16 and its FEIS, NEFMC failed to consider any – let alone all – reasonable alternatives to the ABC Control Rule it proposed in Amendment 16, in violation of NEPA.  <u>See</u> Plf. Mot. at 35; 40 C.F.R. § 1502.14.  NMFS responds that the Council complied by fully considering one, and preliminarily considering a second, reasonable alternative.  Def. Mot. at 52.  Because the Court finds that NEFMC adequately considered reasonable alternatives to the ABC Control Rule it adopted, and because Plaintiff has not identified any reasonable alternatives that NEFMC failed to consider, the Court rejects Plaintiff's challenge.

As the Court has not yet discussed control rules generally, or Amendment 16's ABC Control Rule in particular, a brief overview is in order.  NMFS describes a "control rule" as a "policy" or "specified approach" based on scientific advice provided by the Council's Scientific and Statistical Committee (SSC) that can be used to help the Council set a variety of catch levels or limits (sometimes referred to as "management measures") for the Fishery.  50 C.F.R. §§ 600.310(f)(1), (2)(iii), (4).

Before an ABC Control Rule comes into play, another important catch level must be set. The MSA requires NEFMC to first assess and specify the "maximum sustainable yield" (MSY),

which is the level of annual catch after which overfishing is predicted to occur for each stock in

the Fishery.  See 16 U.S.C. § 1853(a)(3); 50 C.F.R. § 600.310(e).  Congress, however,

recognized that a certain amount of scientific uncertainty in predicting a stock's overfishing level

is inevitable.  For this reason, the MSA next requires NEFMC to set each stock's "acceptable

biological catch" (ABC) at a level sufficiently below the predicted overfishing level.  See 16

U.S.C. § 1852(g)(1)(B); 50 C.F.R. §§ 600.310(f)(2)(ii)-(4).  (As a point of reference, a stock's

ACL is generally set below the stock's ABC to account for another type of uncertainty in

predicting when overfishing will occur: management uncertainty in monitoring annual catch.

See 50 C.F.R. § 600.310(f)(2)(iv), (5)(i).)

NMFS's National Standards Guidelines direct the Councils to establish an ABC Control

Rule that articulates how the ABC will be set for each stock "as a function of the scientific

uncertainty in the estimate of [the overfishing limit] and any other scientific uncertainty."  Id., §

600.310(f)(2)(iii).  The Rule must operate to ensure that there is no greater than a 50%

probability that overfishing will occur.  Id., § 600.310(f)(4).

The parties agree that the Council fully considered two potential ABC Control Rules: the

proposed action – i.e., the rule that was ultimately adopted – and the "no-action" alternative of

retaining and reclassifying Amendment 13's MSY Control Rule as an ABC Control Rule.  See

Def. Mot. at 52, 55; Plf. Reply at 18; see also Am. 16, § 4.1.2 (AR 773 at 47833-35).  NEFMC

also gave preliminary consideration to a third alternative, a "risk-assessment"-based approach to

setting ABCs developed based on an approach described in an independent research paper, but

this alternative was also rejected following additional scientific testing.  See AR 545 at 31406-

11; AR 833 at 49915-16.

The parties disagree, however, over the significance of considering the "no-action" alternative.  Oceana argues without explanation that maintenance of the status quo would have been unlawful, thus rendering the "no-action" option an impermissible alternative, see Plf. Mot. at 37, while NMFS asserts it could have chosen to maintain the status quo and adapted the MSY Control Rule for the purpose of setting ABC levels.  See Def. Mot. at 56.  Although the Agency ultimately rejected the MSY-Control-Rule option following further scientific testing, this is not a case in which the "no-action" alternative meant doing nothing in response to a statutory mandate for action.  A review of NMFS's analysis of the MSY Control Rule indicates that, in this case, NMFS acted reasonably in initially considering adaptation of that Rule to be a viable alternative to developing a new ABC Control Rule, and it fully considered this alternative to the satisfaction of NEPA.

Amendment 16, its FEIS, and the Agency's Record of Decision explain the process NEFMC followed to evaluate the option of using the MSY Control Rule as an ABC Control Rule.  NMFS's Guidelines require that a fishery's "fishing mortality rate does not jeopardize the capacity of a stock . . . to produce MSY."  50 C.F.R. § 600.310(b)(2)(i).  The MSY Control Rule, by describing the fishing mortality rate predicted to produce MSY for each stock in the Fishery, assisted the Council in setting the MSY for each stock.  See Northeast Multispecies Amendment 13, § 3.1.8 (Dec. 18, 2003).  To do so, it "reduced the . . . fishing mortality rate [limit] as stock size declined below [the stock's biomass target] and called for the target fishing mortality to be set at 75 percent of this limit."  See Am. 16, § 7.2.1.1.2 (AR 773 at 48242).  The MSY Control Rule therefore employed and required stock-specific information.  See also Record of Decision at 3 (AR 889) ("the Amendment 13 MSY control rule (no action) [was] based upon a 75 percent of F [fishing mortality rate] calculated to rebuild the stock in 10 years when the biomass is

greater than ½ biomass at MSY") (emphasis added).  To adapt the MSY Control Rule as an ABC

Control Rule, which must account for scientific uncertainty, therefore, a <u>stock-specific</u>

calculation of scientific uncertainty would also have to be made.  <u>See</u> Am. 16, § 7.2.1.1.2 (AR

773 at 48242).

Study of this option, however, revealed that such stock-specific calculations were not

currently feasible.  For example, when the Council's Scientific and Statistical Committee (SSC)

suggested that the Plan Development Team test the MSY Control Rule by applying it to stock

assessments from previous years, the results indicated that this approach "would not have ended

overfishing if used for three stocks to set catch levels for 2005 through 2007."  <u>Id.</u>, § 4.1.2 (AR

773 at 47834).  The tests revealed a number of additional shortcomings with the MSY Control

Rule alternative, leading the SSC to observe that "[t]he available data is inadequate to conduct

probabilistic projections for some stocks."  <u>Id.</u>  In other words, the SSC concluded that there was

insufficient information available to quantify scientific uncertainty for each groundfish stock.  <u>Id.</u>

In light of the SSC's conclusions regarding the MSY Control Rule, NEFMC proposed –

and NMFS approved – the following ABC Control Rule, which governs all stocks in one way:

> a. ABC should be determined as the catch associated with 75% of $F_{MSY}$.
>
> b. If fishing at 75% of $F_{MSY}$ does not achieve the mandated rebuilding requirements for overfished stocks, ABC should be determined as the catch associated with the fishing mortality that meets rebuilding requirements ($F_{rebuild}$).
>
> c. For stocks that cannot rebuild to $B_{MSY}$ in the specified rebuilding period, even with no fishing, the ABC should be based on incidental bycatch, including a reduction in bycatch rate (*i.e.*, the proportion of the stock caught as bycatch).
>
> d. Interim ABCs should be determined for stocks with unknown status according to case-by-case recommendations from the SSC.

Id. (AR 773 at 47834-35).[4]

The ABC Control Rule thus differs from the MSY Control Rule in that it relies on a fishing mortality rate that is not adjusted for stock size.  See id., § 7.2.1.1.2 (AR 773 at 48242). In the absence of the data necessary to quantify scientific uncertainty for each stock, the ABC Control Rule employs a consistent, conservative buffer between the overfishing limit ($F_{MSY}$) and the ABC for each stock – i.e., by setting the ABC at 75% of $F_{MSY}$ (or for stocks requiring rebuilding, "at the level of fishing mortality that will allow the rebuilding of the stock under the deadlines set by the Act ($F_{rebuild}$), whichever is lower").  Plf. Mot. at 23; see Am. 16, §§ 4.1.2, 7.2.1.1.2 (AR 773 at 47834-35, 48242).  By employing a more conservative, if non-stock-specific, buffer to account for scientific uncertainty, the SSC concluded that the ABC Control Rule will "always result in ABCs with at least a 50-percent probability of avoiding overfishing." Record of Decision at 37, AR 889 at 52116.

Oceana argues that the Council's evaluation of maintaining the MSY Control Rule does not count as consideration of a reasonable alternative to the ABC Control Rule adopted because "taking no action altogether . . . was not an option under the law."  Plf. Mot. at 35.  In support, Plaintiff cites American Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 19-21 (D.D.C. 2000), for the proposition that NMFS "violated NEPA . . . where it failed to consider any alternative to proposed action besides 'maintaining the status quo.'"  Id. at 35-36.

The facts here are quite different from those in American Oceans Campaign.  That case involved another challenge to an FMP following the 1996 amendment to the MSA (called the "Sustainable Fisheries Act"), which required the Councils, for the first time, to submit amendments to their various FMPs that described and identified essential fish habitats in the

---

[4] "'$F_{MSY}$' refers to the fishing mortality rate at maximum sustainable yield; '($F_{rebuild}$)' refers to the fishing mortality rate necessary to rebuild overfished stocks within the rebuilding period; '$B_{MSY}$' refers to biomass at maximum sustainable yield."  Plf. Mot. at 36 n.6.

fisheries they managed.  Id., 183 F. Supp. 2d at 5.  The Councils submitted only EAs resulting in findings of no significant environmental impact, rather than EISs, for their FMP amendments, and considered no alternatives to the proposed action other than taking no action – i.e., not describing and identifying essential fish habitats as the statute required.  Id. at 19-20.  Here, on the other hand, NEFMC prepared an EIS; moreover, the "no-action" alternative actually meant the consideration (and limited modification) of an alternative, pre-existing control rule, rather than the option of adopting no control rule at all.  The Court thus agrees with NMFS that this case is procedurally closer to Tongass Conservation Society v. Cheney, 924 F.2d 1137 (D.C. Cir. 1991), where the D.C. Circuit upheld a NEPA analysis in which the agency considered and preliminarily rejected multiple alternative sites for submarine testing and was left with no reasonable alternative to fully consider other than the proposed action.

Oceana's contention that NMFS failed to consider any reasonable alternatives to the ABC Control Rule, therefore, is incorrect.  Although the MSY Control Rule ultimately proved inadequate to prevent overfishing, the Court cannot say that the underlying scientific approach the Council pursued in considering that alternative was unreasonable.  In this regard, the Court will defer to the Agency.  See Oceana, Inc. v. Evans, 384 F. Supp. 2d at 246 ("Where the agency relies upon its scientific expertise, the Court's role is to assure that it has met 'certain minimal standards of rationality' in designing a reasonable range of alternatives." (quoting American Oceans Campaign, 183 F. Supp. 2d at 12)); Tongass Conservation Society, 924 F.2d at 1140 ("'rule of reason' . . . governs both 'which alternatives the agency must discuss' and 'the extent to which it must discuss them.'" (quoting National Resources Defense Council, Inc. v. Hodel, 865 F.2d at 294)) (emphasis in original).

A question remains, however, regarding whether NEFMC evaluated <u>all</u> reasonable alternatives as NEPA requires.  At the heart of this question lies the reality that an ABC Control Rule is a highly technical tool for evaluating scientific uncertainty in the context of a complex fishery-management regime.  The identification of reasonable alternatives to FMP proposals is precisely the type of agency decision to which the Court should properly defer in the absence of any "obvious" unexamined reasonable alternatives, and it is certainly not the Court's role to somehow determine what such other alternatives might be.  <u>Oceana v. Evans</u>, 384 F. Supp. 2d at 244; <u>see also</u> <u>American Oceans Campaign</u>, 183 F. Supp. 2d at 11–12 ("Where the agency decision turns on issues requiring the exercise of technical or scientific judgment, it is essential for judges to 'look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.'" (quoting <u>Ethyl Corp. v. EPA</u>, 541 F.2d 1, 36 (D.C. Cir. 1976) (*en banc*))).  Here, nothing in the administrative record or the Agency's briefing suggests the existence of reasonable or feasible unconsidered alternatives to the ABC Control Rule.

Neither is this a case in which Plaintiff has proposed a reasonable alternative to the ABC Control Rule that it claims Defendants ignored.  Oceana complains that the FEIS fails to evaluate all reasonable alternatives to Amendment 16's ABC Control Rule, yet Plaintiff does not identify any concrete alternative proposals that the Council failed to consider.  Oceana's pre-approval comments regarding the Rule, while sufficient to defeat NMFS's contention that Plaintiff waived its right to assert a claim based on NEPA's reasonable-alternatives requirement, <u>cf.</u> <u>Department of Transportation v. Public Citizen</u>, 541 U.S. 752, 764-65 (2004), amount to little more than a recitation of the National Standards Guidelines for ABC Control Rules generally, <u>see</u> 50 C.F.R. §

600.310(f)(4), and an exhortation to NEFMC to follow the Guidelines.  See Letter from D.

Allison to P. Kurkul re "Comments on the NE Multispecies Amendment 16 FEIS" (Dec. 17,

2009) at 2-4 (AR 864 at 50534-36).  While Oceana suggests that other fisheries are developing

alternative ABC Control Rules that more closely conform to the Guidelines, it does not identify

such a reasonable alternative for the Multispecies Fishery.  Id. at 3.

 The list of alternatives to the ABC Control Rule that the Council considered is

undoubtedly short.  The court in Tongass Conservation Society, however, upheld an EIS that

conducted only preliminary evaluations of alternative proposals and concluded that no other

reasonable alternatives were available.  924 F.2d at 1140-42.  Courts do not evaluate an agency's

NEPA compliance based solely on the number of alternative courses of action considered, but

rather defer to the agency on this question so long as the agency's action is not arbitrary and

capricious.

 Here the Council considered, and had its scientists test, two alternatives to the ABC

Control Rule.  This testing revealed that neither alternative would consistently prevent

overfishing.  Conversely, independent testing confirmed that the ABC Control Rule would

consistently prevent overfishing limits from being exceeded with the required level of

probability.  See Record of Decision at 37, AR 889 at 52116 (explaining how "the ABC control

rule would always result in ABCs with at least a 50-percent probability of avoiding

overfishing").  The Court thus finds that Amendment 16's FEIS contains sufficient information

regarding the ABC Control Rule and its alternatives, as well as the Council's selection decision,

to comply with the requirements of NEPA.  Summary judgment in favor of Defendants is thus

appropriate on Oceana's NEPA challenges.

**IV.     Conclusion**

       For the reasons articulated above, an Order accompanying this Memorandum Opinion will grant summary judgment in favor of Defendants on all issues except for Plaintiff's second claim for relief – namely, that Amendment 16 fails to establish sufficient accountability measures for five stocks in the Multispecies Fishery.  Given the nature of this deficiency, the Court perceives no reason why any part of Amendment 16 should be vacated.  Instead, the issue of establishing accountability measures for the five stocks will be remanded to NMFS and NEFMC for further action consistent with this Memorandum Opinion.

**SO ORDERED**.

                                        /s/ *James E. Boasberg*
                                        JAMES E. BOASBERG
                                        United States District Judge

Date:  December 20, 2011